# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-3134 & 02-3153

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM M. PATTERSON and DARYL L. SMITH,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 108—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED SEPTEMBER 11, 2003—DECIDED OCTOBER 22, 2003

———————

Before FLAUM, Chief Judge, and POSNER and EASTERBROOK, *Circuit Judges.*

FLAUM, *Chief Judge.* William Patterson and Daryl Smith, former Chicago police officers, were tried jointly before a jury on charges of conspiring and attempting to possess with the intent to distribute and to distribute, approximately five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C § 924(c)(1)(A); and theft of government funds in violation

of 18 U.S.C. § 641. Patterson was convicted of all of the charges, and Smith was acquitted of all charges except for theft of government funds. Patterson appeals his convictions, contesting the sufficiency of the evidence presented on the conspiracy and firearm charges, and further arguing that it was error to allow a verdict form that permitted the jury to find lesser quantities of cocaine attributable to him than that charged in the indictment. Smith appeals his sentence, arguing that the district court wrongfully considered for sentence enhancement purposes the allegations that formed the basis of the charges for which he was acquitted. For the following reasons we affirm the district court's decision.

## I. Background

At the time of his arrest, William Patterson was a Chicago police sergeant and a 28-year veteran of the police force. He was assigned to the Public Housing Division, where he worked in a plainclothes tactical unit devoted to fighting crime in public housing projects. Patterson supervised several officers, including defendant Daryl Smith.

When Patterson began to experience financial difficulties due to the cost of his divorce and child custody litigation, he approached a longstanding friend, Arthur Veal. Patterson told Veal that he occasionally supplemented his income by stopping suspected drug dealers and seizing their cash for his personal use, without effectuating formal arrests. Veal mentioned that he was aware of other police officers who engaged in similar practices.

Patterson visited Veal at Veal's trucking business on January 13, 2001. Veal informed Patterson of an opportunity to collaborate with a "Mexican male" drug dealer who wished to rip-off his boss's stash house, meaning that he wished to steal the drug money and narcotics stored in the stash house. Veal said that the rip-off would involve approximately $500,000 cash, and five to ten kilograms of

cocaine. Veal explained that the cash would be divided between Veal, Patterson, and Patterson's assistants, should he require any. The drugs, however, were to be delivered to the collaborating drug dealer. Patterson indicated interest and mentioned that he would enlist Officer Smith, known as "Smitty," as his aid. That evening, there were five phone calls between Patterson's and Smith's cell phones.

Unbeknownst to Patterson, the police had apprehended Veal with a large amount of cocaine and cash in November 2000. In exchange for a more favorable plea agreement, Veal had begun to cooperate with the FBI by aiding their investigations of official corruption and the trade of narcotics. Veal recorded many of the conversations that ensued between Patterson and himself regarding the planned rip-off.

On January 19, 2000 Patterson visited Veal at his place of business. The meeting was recorded by FBI surveillance. Veal informed Patterson that the stash house would be empty during the rip-off. According to the plan, the collaborating drug dealer, his boss, and the boss's wife would not be present. Veal confirmed that there would be "10 keys," meaning kilograms, of cocaine and "550 to 600," meaning $550,000 to $600,000, in cash in the stash house. Patterson was to remove the cocaine and the cash. Veal reminded Patterson that all of the stolen cocaine would be delivered to the collaborating drug dealer, while the cash would be divided between Veal, Patterson, and Patterson's assistants.

Patterson and Veal also discussed "Plan B," the back-up plan. If a neighbor noticed the rip-off and complained, Patterson was to pretend that he was on official police business and inventory one kilogram of cocaine at the police station. If the rip-off was undetected, however, Patterson was not to do an official police inventory of any cocaine.

Veal concluded the meeting by instructing Patterson to "tell Smitty after you do this gig [you] have to stop sticking up the projects now. Don't be snatching no money out of nobody hand." Patterson replied that he and Smith had stolen drugs and money from hiding places in the Chicago public housing projects earlier that very day, and that they had also planted drugs on a suspect.

Veal and Patterson had numerous discussions on the phone between January 22 and January 31, 2000, some of which were recorded. During a recorded conversation on January 22, Patterson told Veal that Smith had said that the rip-off "looks like retirement." On a recorded conversation on January 31, Veal told Patterson that he should find two bags at the stash house, intimating that one would contain cocaine, while the other would contain approximately $600,000 in cash. Patterson said that he and Smith planned to enter the stash house through the front door with the use of a key, but would break the lock on the back door on the way out to create the appearance of a forced entry. Veal told Patterson to bring the stolen cocaine to the Jewel grocery parking lot at 50th Street and Kedzie Avenue in Chicago, where Veal would be waiting in his truck with the collaborating drug dealer. Finally, Veal promised to provide Patterson with the address and keys to the stash house at a meeting the following day.

Before Veal and Patterson met on the morning of February 1, 2001, the FBI provided Veal with an envelope containing the address to an FBI undercover apartment that would serve as the "stash house," and a map of the area. The FBI undercover apartment was equipped with audio and video recording equipment. An FBI agent had placed a black garbage bag containing $20,000 cash and a red gym bag containing five one-kilogram bricks of sham cocaine in the apartment.

When Veal and Patterson met on the morning of February 1, 2001, Veal gave Patterson the envelope that the FBI

had given to him, as well as keys to the main door of the apartment building and to the front door of the FBI undercover apartment. Veal reconfirmed that Patterson would find five kilograms of cocaine in one bag and cash in another. Patterson agreed to place the bag containing the cocaine into Veal's truck, which would be parked at the Jewel grocery store parking lot, as described during the phone conversation the previous day. Further, Veal stated that he would meet Patterson at a later time to divide the stolen cash.

Later that day, the defendants, while on-duty and armed, drove an unmarked Chicago Police Department Caprice with municipal plates to the undercover apartment, arriving just after noon. The apartment was not Chicago public housing, and neither officer had obtained permission to conduct police operations at that location. Although Chicago Police Department policy does not permit officers to conceal their faces behind masks while conducting searches, both defendants were wearing masks. In addition, Smith carried a battering ram and Patterson carried a duffel bag.

Patterson and Smith entered the apartment and began searching for the bags. Patterson found the garbage bag containing $20,000 cash, as well as the red gym bag containing the five one-kilogram sized bricks of sham cocaine. After looking inside the red gym bag, he placed it and the garbage bag of cash in his duffel bag.

Before leaving, the defendants tried to create the appearance of a raid. Patterson gently removed a television from its stand and tossed a chair cushion on the floor. Patterson also emptied the trash onto the floor. Smith tilted over a lamp in the living room and emptied the contents of a kitchen cabinet onto the floor. On their way out, one of the defendants broke the lock on the front door.

Patterson and Smith then entered the unmarked Chicago Police Department Caprice with the duffel bag. After arriving at the Jewel parking lot, Smith stepped out of the Caprice with the red gym bag, which was concealed in a black garbage bag, and placed it in Veal's truck. Patterson and Smith then drove to Patterson's home. They did not inventory any of the sham cocaine or cash at the police station.

Later that day, the FBI arrested Patterson and Smith. In Patterson's home, the FBI found the $20,000 taken from the undercover apartment. After receiving the *Miranda* warnings, Patterson confessed to going to the undercover apartment to obtain a black bag which he believed to contain up to $800,000 in cash and four or five kilograms of narcotics.

At trial, the government published audio and video recordings to the jury. While testifying on his own behalf, Patterson denied that he had intended to engage in a cocaine conspiracy. Patterson maintained that he believed that he was helping Veal to recover money owed to him, as a favor for Veal's willingness to loan Patterson money in the past. Further, Patterson testified that he did not tell Smith that the raid would involve narcotics. Smith did not testify.

The jury convicted Patterson of attempt and conspiracy to possess with intent to distribute and to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a) and 846; possession of a firearm in relation to a drug trafficking charge in violation 18 U.S.C. § 924(c)(1)(A); and theft of public money, property or records in violation 18 U.S.C § 641. Smith was acquitted of all charges except theft of public money, property or records in violation of 18 U.S.C § 641. The jury completed a special verdict form that specified the quantity of cocaine for which it found Patterson responsible. By selecting from the following

weight ranges—five or more kilograms; 500 grams, but less than five kilograms; or less than 500 grams—the jury found the quantity of 500 grams, but less than five kilograms.

The district court sentenced Patterson to 235 months imprisonment for the two violations of 21 U.S.C. §§ 841(a) and 846, to run concurrently; 120 months for the violation of 18 U.S.C § 641, to run concurrently; and sixty months for the violation of 18 U.S.C. § 924(c)(1)(A), to run consecutively. Regarding Smith's sentence, the district court made the following findings that resulted in an increase from a base level of six to a base level of thirty-six: possession of a firearm; abuse of a position of public or private trust; and theft of a controlled substance. Smith was sentenced to 120 months, the statutory maximum under 18 U.S.C. § 641.

## II. Discussion

### A. Sufficiency of the Evidence: Conspiracy

Patterson argues that there was insufficient evidence to sustain the jury's finding of guilt on the conspiracy charge, in light of the jury's acquittal of Patterson's sole alleged co-conspirator. Due to the inconsistent verdicts, Patterson urges, his conviction cannot stand absent "overwhelming evidence" of conspiracy. Further, he argues that the government failed to present overwhelming evidence of a cocaine conspiracy in this case.

Patterson's argument assumes that inconsistent jury verdicts are subject to a different standard of review for sufficiency of the evidence than are consistent jury verdicts. But jury verdicts need not be consistent, nor are they reviewed on the grounds of consistency. Jury verdicts are "insulate[d]" from review on such grounds. *See United States v. Powell*, 469 U.S. 57, 69 (1984) (reaffirming *Dunn v. United States*, 284 U.S. 390 (1934)). This court has held that the reasoning of *Powell* and *Dunn* applies with equal

force to cases where inconsistent verdicts are rendered against co-defendants on conspiracy charges. *See United States v. Mancari*, 875 F.2d 103, 104 (7th Cir. 1989) ("Although *Powell* and *Dunn* are cases where the inconsistent verdict was rendered against one defendant, their reasoning applies with undiminished force to a case in which the jury has treated co-defendants inconsistently."). As *Mancari* explains, "the acquittal of a co-defendant may have been motivated by sympathy for that defendant . . . the jury . . . may have acquitted him lawlessly . . . . After *Powell* there can be no presumption that the jury acquitted . . . because the government failed to prove him guilty beyond a reasonable doubt, and convicted [the co-defendant] lawlessly." *Id.* Thus, the inconsistency of the jury verdicts regarding Patterson's and Smith's alleged participation in a conspiracy and attempt to possess narcotics is not significant to the review of Patterson's conviction for the sufficiency of the evidence.

Moreover, review for the sufficiency of the evidence provides adequate protection against any problem caused by inconsistent jury verdicts. *See Powell*, 469 U.S. at 67. "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt . . . we do not believe that further safeguards against jury irrationality are necessary." *Id.*

Nevertheless, Patterson submits that the inconsistency of the verdicts requires this court to impose a heightened evidentiary standard when reviewing the sufficiency of the evidence of his conviction for conspiracy. Patterson wrongly construes a comment in *Mancari* as imposing such a standard. In *Mancari*, this court stated that "if there is overwhelming evidence of conspiracy, the jury will be assumed not to have convicted lawlessly the conspirator it convicted but instead to have acquitted the other(s) lawlessly."

*Mancari*, 875 F.2d at 104. *Mancari* merely explains that overwhelming evidence is sufficient to demonstrate the law-fulness of the conviction; it does not *require* overwhelming evidence for the conviction to stand. As stated above, review for sufficiency of the evidence, which asks whether "the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt" is all that is required. *See Powell*, 469 U.S. at 67.

In reviewing the sufficiency of the evidence, the "evidence and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the government." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001) (quoting *United States v. Frazier*, 213 F.3d 409 (7th Cir. 2000)). "The test is whether, after viewing the evidence, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jackson*, 300 F.3d 740, 747 (7th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

"A conspiracy under 21 U.S.C. § 846 requires that (1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in the agreement. No overt act is required." *United States v. Gardner*, 238 F.3d at 879. To demonstrate an agreement, the government may rely on inferences. *United States v. Moya-Gomez*, 860 F.2d 706, 758 (7th Cir 1988). "Direct evidence of intent is rarely available. Thus, circumstantial evidence 'as a practical matter . . . is often all that exists.'" *Id.* (quoting *United States v. Page*, 580 F.2d 916, 920 (7th Cir. 1978)).

Although Patterson concedes that the evidence demonstrated that he participated in an attempt to possess narcotics, he argues that the evidence was insufficient to prove that he had a knowing co-conspirator. We disagree. The evidence includes the following: Patterson told Veal that

Smith was the only person whom he trusted to be his aid; Patterson told Veal that he and Smith had ripped off narcotics in hiding places in public housing projects; Patterson told Veal that Smith said that the rip-off "looks like retirement"; Patterson and Smith entered the place to be searched with a key and without a warrant; Smith wore a mask during the encounter; Smith carefully turned over a lamp and emptied a kitchen cabinet after Patterson signaled to him that the search for cocaine and cash was complete; Smith delivered the bricks of sham cocaine to Veal's truck. Based on these facts, the jury could rationally infer that an experienced police officer such as Smith would have known that he was not involved in a legitimate police raid. The government presented sufficient evidence for a rational jury to find beyond a reasonable doubt that Patterson and Smith were both knowing members of the narcotics conspiracy charged.

### B.  Sufficiency of the Evidence: Firearm

Patterson appeals his conviction under 18 U.S.C. § 924(c) for possessing and carrying a firearm in relation to a drug trafficking offense. Patterson does not dispute that he possessed his loaded service revolver while attempting to steal approximately four or five kilograms of narcotics. Rather, he argues that the government failed to prove that he carried the firearm for the purpose of accomplishing the cocaine rip-off. In reviewing his challenge to the sufficiency of the evidence, "we review all the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. James*, 923 F.2d 1261, 1267 (7th Cir. 1991). "The test is whether, after viewing the evidence, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson*, 300 F.3d at 747 (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).

Under 18 U.S.C. § 924(c)(1)(A), "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" is subject to punishment under § 924(c). "The phrase 'in relation to' . . . clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence . . . the gun at least must facilitat[e], or ha[ve] the potential of facilitating, the drug trafficking offense." *United States v. Smith*, 508 U.S. 223, 238 (1993) (internal quotations omitted).

Under Patterson's view, the evidence was insufficient to prove that his possession of a firearm was for the purpose of facilitating the rip-off. He argues that the firearm's presence on his person was the mere byproduct of his having the status and equipment of an on-duty police officer while he committed criminal acts. Were it not for the Chicago Police Department General Order 98-10-02, which requires "sworn members . . . [to] have in their possession . . . while on duty . . . [a] prescribed firearm, fully loaded," he argues that he would not have needed the firearm during the rip-off. In support, he states that he did not remove the firearm from its holster during the rip-off; he did not search every room of the apartment; and "Plan B" did not require that he use a firearm. Thus, he submits that the government failed to demonstrate that his possession of a firearm was more than a mere coincidence. We disagree.

The government presented sufficient evidence for a rational jury to find that Patterson possessed a firearm in relation to the attempted cocaine rip-off. First, the firearm was a necessary prop for "Plan B," which required Patterson to pretend to be performing a legitimate police raid of the FBI undercover apartment. A legitimate raid requires legitimate looking officers, who would be carrying firearms. Second, the jury could have reasonably concluded

that the firearm provided Patterson with a necessary sense of security, especially in light of Patterson's repeated suppositions to Veal that the "Mexican male" might be untrustworthy. The government provided adequate evidence for a rational jury to find that Patterson's possession of a firearm during the rip-off was purposeful, rather than inadvertent.

Further, Patterson's position as a Chicago police sergeant does not empower him to commit crimes with impunity. "Congress intended section 924(c) to apply to police officers who 'abuse that privilege [of being licensed to carry a firearm] by committing a crime with the weapon.'" *United States v. Contreras*, 950 F.2d 232, 241 (5th Cir. 1991) (quoting S.Rep. No. 225, 98th Cong., 2d Sess. 315 n. 10 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3492 n. 10.)

### C. Constructive Amendment of the Indictment

Patterson argues that because the indictment charged a drug quantity of approximately five kilograms of cocaine, but the special verdict form permitted the jury to find a lesser quantity of cocaine, the indictment was constructively amended in violation of the Fifth Amendment. "Whether a trial judge constructively amended portions of the indictment is a question of law that the Court of Appeals reviews *de novo*." *United States v. Trennel*, 290 F.3d 881, 886 (7th Cir. 2002), *United States v. Pigee*, 197 F.3d 879, 885 (7th Cir. 1999).

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury." U.S. Const. amend. V. When the evidence produced at trial "goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury," the indictment is constructively amended in violation of the Fifth Amendment. *United States v. Willoughby*, 27 F.3d 263, 266 (7th

Cir. 1994). "A constructive amendment to an indictment occurs when either the government . . . the court . . . or both, broadens the possible bases for conviction beyond those presented by the grand jury." *Trennel*, 290 F.3d at 888 (quoting *U.S. v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998)).

However, there is no constructive amendment when the defendant is convicted of the same offense for which he was charged in the indictment. *See United States v. Pigee*, 197 F.3d 879, 886 (7th Cir. 1999) (holding that a variance is benign if it "does not create a risk of conviction for an uncharged offense."); *see also Trennel*, 290 F.3d at 888 ("In order to rise to the level of constructive amendment, the change must establish offenses different from or in addition to those charged in the indictment.").

Here, Patterson was convicted of the same charges for which he was indicted: violations of 21 U.S.C. §§ 841(a)(1) and 846. Under § 841(a)(1), it is unlawful to knowingly "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 846 extends the penalties under § 841 to those who conspire or attempt to commit an offense under § 841. *See* 21 U.S.C. § 846. It is well established that "[d]rug quantity is not an element of a § 841 drug offense." *United States v. Smith*, 308 F.3d 726, 740 (7th Cir. 2002), *see, e.g.*, *United States v. Bjorkman*, 270 F.3d 482, 490-91 (7th Cir. 2001). Indeed, a jury need not make any finding of drug quantity for a conviction under § 841 to stand. *Smith*, 308 F.3d at 741. Thus, Patterson's convictions for conspiracy and attempt under §§ 841 and 846 matched the charges for which he was indicted, notwithstanding the jury's finding that the conspiracy and attempt involved more than 500 grams but less than five kilograms of cocaine, and the indictment charged a conspiracy and attempt involving approximately five kilograms of cocaine.

Patterson also argues that his sentence violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the district court relied upon the base offense level under U.S. Sentencing Guidelines Manual § 2.D.1.1(c)(2002) for five kilograms of cocaine—the quantity of cocaine charged in the indictment—and not the lesser quantity found in the jury's special verdict, in calculating his sentence. "*Apprendi* holds that '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.'" *United States v. Jones*, 248 F.3d 671, 676 (7th Cir. 2001) (quoting *Apprendi*, 530 U.S. at 490). "However, a particular sentence does not implicate *Apprendi* 'unless it exceeds a default statutory maximum.'" *United States v. Johnson*, 335 F.3d 589, 591 (7th Cir. 2003) (quoting *United States v. Knox*, 301 F.3d 616, 620 (7th Cir. 2002)). As Patterson was sentenced to two concurrent sentences of 235 months for the convictions under §§ 841 and 846, and the maximum sentence provided by § 841(b)(1)(c) is twenty years, or 240 months, his sentence does not violate *Apprendi.*

Patterson urges this court to hold that the *Apprendi* rule prohibits sentences that are within the maximum authorized by the statute of conviction, if the sentence exceeds the U.S. Sentencing Guidelines range for the quantity of narcotics found by the jury. This argument fails because it wrongly assumes that drug quantity is an element of the § 841 offense. Further, this court has established that "*Apprendi* does not apply to the district court's determination of the amount of cocaine found." *United States v. Johnson*, 335 F.3d 589, 592 (7th Cir. 2003). The "Sentencing Guidelines instruct *the judge* . . . to determine . . . the amount . . . of 'controlled substances' for which a defendant should be held accountable—and then to impose a sentence that varies depending upon amount . . . regardless of the jury's actual, or assumed, beliefs about the conspiracy." *Edwards*

*v. United States*, 523 U.S. 511, 513-514 (1998) (emphasis in original); *Talbott v. Indiana*, 226 F.3d 866, 870 (7th Cir. 2000).

A district court may consider the quantity of narcotics proven by a preponderance of the evidence in assessing the appropriate sentence. *United States v. Martinez*, 301 F.3d 860, 865 (7th Cir. 2002). In this case, the district court found by a preponderance of the evidence that Patterson had attempted and conspired to possess five kilograms of cocaine, despite the jury's finding of a lesser quantity of cocaine. Patterson does not argue that a preponderance of the evidence failed to support the district court's finding. The resulting sentence did not violate the rule of *Apprendi*.

### D.  Smith's Sentence

Smith argues that the district court wrongfully enhanced his sentence in violation of the rules of *Apprendi* and *Ring v. Arizona*, 536 U.S. 584 (2002), because it considered as relevant the allegations that formed the basis of the charges for which he was acquitted. Whether the district court's sentence of Smith is unconstitutional is a question of law, and is reviewed *de novo. United States v. Chemetco, Inc.*, 274 F.3d 1154, 1158 (7th Cir. 2001).

As discussed above, a sentence does not implicate *Apprendi* "unless it exceeds a default statutory maximum." *Knox*, 301 F.3d at 620. Smith was convicted under 18 U.S.C. § 641, which states that whoever is convicted under the section "[s]hall be fined under this title or imprisoned not more than ten years, or both." As Smith's sentence of 120 months is the statutory maximum sentence prescribed by the statute of conviction, it does not implicate *Apprendi*.

Smith argues that his sentence violates *Apprendi* as it was interpreted by *Ring.* Smith submits that *Ring* prohibits

a sentencing court from employing aggravating factors un-
der the U.S. Sentencing Guidelines, unless those factors
have been submitted to the jury and proven beyond a rea-
sonable doubt, even if the resulting sentence is within the
maximum provided by the statute of conviction. He argues
that a sentencing court cannot base sentence enhancements
on allegations for which a defendant was acquitted, because
doing so ignores the facts reflected in the jury verdict. We
disagree.

It is established that "a sentencing court may consider
conduct of which a defendant has been acquitted." *United
States v. Watts*, 519 U.S. 148, 154 (1997). As the *Watts* court
reiterated, "acquittal on criminal charges does not prove
that the defendant is innocent; it merely proves the exis-
tence of a reasonable doubt as to his guilt." *Watts*, 519 U.S.
at 155 (quoting *United States v. One Assortment of 89
Firearms*, 465 U.S. 354, 361 (1984)). Unlike the burden of
proof at trial, relevant facts need to be proven only by the
preponderance of the evidence at sentencing. *Watts*, 519
U.S. at 156. Smith's argument, however, would limit a sen-
tencing court to the consideration of facts proven beyond a
reasonable doubt.

Contrary to Smith's argument, *Ring* does not require
that all sentence enhancements be proven beyond a rea-
sonable doubt. Rather, in *"Ring*, the Court held that, under
*Apprendi*, additional facts increasing a statutory maximum
punishment from life imprisonment to death must be sub-
mitted to the jury and proven beyond a reasonable doubt."
*Johnson*, 335 F.3d at 591 (citing *Ring*, 536 U.S. at 609).
Thus, *Ring* is an application of the *Apprendi* rule that pre-
cludes a defendant from "being expose[d] . . . to a penalty
exceeding the maximum he would receive if punished
according to the facts reflected in the jury verdict alone."
*See Apprendi*, 503 U.S. at 483. In *Ring*, the jury verdict
of first-degree murder authorized a maximum sentence

of life imprisonment; the sentencing court could not enter a death sentence unless it made further factual findings. *Ring*, 536 U.S. at 597. Smith's case is wholly unlike *Ring*, in that the jury verdict in Smith's case reflected a violation of 18 U.S.C. § 641, which itself authorized a ten year sentence. Despite the sentencing court's base level enhancement under the U.S. Sentencing Guidelines, Smith's sentence does not exceed the statutory maximum authorized by the jury verdict, and therefore does not violate *Ring*.

### III.  Conclusion

For the reasons stated we hereby AFFIRM Patterson's convictions and Smith's sentence.

A true Copy:

       Teste:

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*