# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2574

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ULICE ASKEW,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 37—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED APRIL 6, 2004—DECIDED APRIL 5, 2005

———————

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* Ulice Askew challenges the sufficiency of the evidence supporting his conviction under 21 U.S.C. § 846 for conspiracy to possess with intent to distribute PCP. He argues that the only credible evidence against him established one PCP spot purchase amounting to a buyer-seller relationship only, not a conspiracy. Relatedly, Askew argues that the district judge committed plain error by failing to supply the jury with a buyer-seller instruction. He also asserts that the judge failed to answer appropriately the jury's questions during deliberations about the conspiracy count. His final ground for appeal alleges that

the judge committed plain error when she failed to suppress evidence obtained through an unconstitutional stop that led to his arrest. For the reasons discussed below, we affirm.

## I. History

Christine Williams worked for Napoleon "Pokey" Moore as a PCP distributor beginning in June 1999. Her relationship with Moore ended in December 2001, when she was arrested and agreed to cooperate with the FBI.

According to Williams, Askew was one of the customers to whom she regularly sold PCP. Williams testified that her business relationship with Askew began in the summer of 2000, after Moore directed her to sell PCP to Askew to "help him get back on his feet."[1] Moore set the prices for the PCP sold, often allowing Askew to pay a portion of the price, with the remainder to be paid at the next buy. For a time, Moore also charged Askew less for PCP than he charged other customers. Williams believed Askew and Moore to be "best friends."

Williams sold PCP to Askew almost weekly between the summer of 2000 and her arrest in December 2001. Askew would contact either Moore or Williams to let them know when he needed the drugs. Williams testified that Askew purchased a total of sixteen ounces (453 grams) to twenty ounces (566 grams) of PCP each month and that she would typically make deliveries to his home on South Millard Avenue in Chicago. According to the expert witness presented by the government, sixteen ounces, or one pint, of PCP amounted to 10,000 to 20,000 individual doses.

On January 4, 2002, after her arrest and while in FBI custody, Williams received a call from Askew. He intro-

---

[1] Askew testified that he declared bankruptcy in 1999 following release from prison for a non-drug-related felony.

duced himself as "Pokey['s] guy" from "off Millard." When she asked him what he was "tryin' to do," he responded, "[A] whole one." Williams then said, "The whole one? . . . [Y]ou usually get the half. What you talkin' about a whole one?" Askew responded, "You know[,] the two fours," which Williams understood to mean eight ounces of PCP. In another call that same day, Askew told Williams that Moore set the price of the purchase at a "stack," or $1000.

At the FBI's direction, Williams called Askew on January 9, 2002, and proposed that the buy take place at the Homan Square Theater, located in a busy strip mall. Williams told Askew that Moore said she could sell him a "pop" (sixteen ounces of PCP) for $1300, which was a better price than $1000 for an "eight" (eight ounces of PCP). Askew told Williams that all he could come up with was $1100. As had been done in the past, Williams proposed that he pay the $1100 up front and supply the remaining $200 later. The two agreed to meet at 11:00 A.M. that same day. Askew informed Williams that she could find him in a white Cadillac.

At 11:05 A.M., Williams called Askew to check on his status. Askew stated that he had already been to the meeting place and had just left. Williams, who was actually in the Dirksen Federal Building with her FBI handlers in downtown Chicago, represented that she was just arriving in her car and asked him to turn around and meet her, which she said should take "two or three minutes." Askew agreed and again indicated he could be recognized by the white Cadillac. Shortly thereafter, Williams again called Askew to tell him she had arrived and to determine his whereabouts. Askew stated that he was in the parking lot and described his location—"by that little red truck. Where that lady walkin [sic]." When Williams protested that she could not see him, he told her he was pulling out and was "in front of the theater now" but in "another car." The call then cut off.

All of these calls, beginning with the January 4, 2002, contact and others, were recorded and played for the jury at trial.

Unbeknownst to Askew, FBI agents and Chicago police were positioned outside of the Homan Square Theater in unmarked cars. The agents sitting with Williams four miles away relayed, by radio, the content of her conversations with Askew to the law enforcement officers attempting to perform the arrest. The officers correctly identified a silver Hyundai Accent as the car carrying Askew based on the information provided by Williams through her handlers and also due to the car's suspicious maneuvers—it was circling the lot as if its passengers were looking for someone. The agents blocked the vehicle with theirs and, with guns drawn, removed the occupants. Once Askew identified himself, they placed him under arrest and conducted a safety search. The agents found $1189 in cash.

While in custody, Askew signed a confession stating that in October 2001 he purchased one ounce (28 grams) of PCP from Williams for $200 and resold it for $300. He also admitted to his unsuccessful attempts to purchase more PCP from Williams in November 2001 and to his intent to buy sixteen ounces of PCP from Williams the day of his arrest.

At trial, the government's evidence consisted primarily of Williams's testimony, Askew's confession, a pen register showing that Askew called Williams eighteen times between September 2001 and December 2001, and the recorded phone calls between Williams and Askew. Askew testified in his own defense and stated that he never, at any time, purchased or intended to purchase PCP from Williams. Rather, he claimed that he planned to buy stereo speakers (his brother had previously testified the speakers were called "pops") from Williams the day of his arrest, which were to be used to help promote his brother's rap CD. He told the jury that he met Williams through Moore, but that Moore was a casual acquaintance that he had spoken to only three times—once around 1989 at an album release party,

another time when he ran into him at a mall about twelve years later in 2001, and again sometime in late 2001. During the mall conversation, according to Askew, Moore put him in touch with Williams because her nephew was interested in the rap music industry. During the third conversation, Askew said he and Moore discussed the speakers Askew wanted to buy and that they worked out a package deal for the purchase. Askew testified that he had only spoken to Williams about five times in his life, and that she had never been to his house. He also disavowed his written confession, contending that he never even read it—he signed it only because he was scared and was told that the confession merely indicated his willingness to cooperate with the FBI.

The jury returned a verdict of guilty on all three counts charged. The verdict form for Count I (the conspiracy count and the only count at issue here) asked the jury to determine the amount of PCP attributable to Askew: one kilogram or more; 100 grams but less than one kilogram; or less than 100 grams. The jury chose the third option—less than 100 grams.

At sentencing, the district judge determined that 8,000 to 10,000 grams (eight to ten kilograms) of PCP was attributable to Askew on Count I. The judge also determined that Askew lied at trial about his involvement with the PCP conspiracy and gave him a two-level enhancement for obstruction of justice. The district court sentenced him to 210 months' imprisonment on the conspiracy count, to be served concurrently with the sentences rendered on the other two counts of the indictment.

## II. Analysis

### A. Sufficiency of the Evidence

Askew challenges the sufficiency of the evidence supporting his conviction on the indictment's conspiracy count. His sole argument relies on the jury's decision, in rendering its

verdict, to attribute less than 100 grams of PCP to him. He reasons that the jury, who heard Williams testify to selling thousands of grams to Askew over a year-and-a-half period, must have completely discounted her witness testimony and accepted as true Askew's confession that he purchased one ounce (28 grams) of PCP. Otherwise, Askew argues, the jury would have attributed far more PCP to Askew than it did. Based on that premise, Askew asserts that we should follow what he believes is the jury's lead and review the record sanitized of Williams's testimony. The remaining evidence, Askew posits, establishes not a conspiracy, but rather, at most, a buyer-seller relationship premised on spot purchases.

Because Askew's sufficiency of the evidence appeal hinges on our treatment of Williams's trial testimony, we must first determine whether, as Askew suggests, we should disregard it based on the jury's verdict. Askew's issue is somewhat unique: most defendants challenging their convictions because of verdict inconsistencies do so because they were acquitted on some counts that would seem to require acquittal on others of which they were found guilty, *e.g.*, *United States v. Conn*, 297 F.3d 548, 557 (7th Cir. 2002) (defendant acquitted on five counts of willfully dealing firearms without a license but convicted on sixth), or because they were convicted when co-defendants were acquitted under the same evidence, *e.g.*, *United States v. Patterson*, 348 F.3d 218, 224 (7th Cir. 2003) (defendant convicted on conspiracy charge and alleged sole co-conspirator acquitted on same charge). Askew's verdict was not inconsistent across counts (the jury found him guilty of all three) or as to co-defendants (there were none). Instead, he argues that the jury's verdict on Count I was internally inconsistent—that he could not have engaged in a conspiracy to distribute PCP, as the jury found, if the amount of PCP attributed to him was less than 100 grams, which the jury also found.

Regardless of how the apparent inconsistency in a jury's determination presents itself, it is well established that "[i]nconsistent verdicts in a criminal case are not a basis for reversal of a conviction or the granting of a new trial." *United States v. Reyes*, 270 F.3d 1158, 1168 (7th Cir. 2001) (collecting authority). This is because the Supreme Court has recognized that inconsistent jury verdicts may occur for various reasons, including mistake, compromise, or lenity. *See United States v. Powell*, 469 U.S. 57, 65 (1984). Here, we do not know why the jury decided to attribute less than 100 grams of PCP to Askew, and neither does Askew. Any attempt to discern the jury's rationale for the verdict "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* at 66; *see also Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir. 1993) ("One enduring element of the jury system, no less vital today than two centuries ago, is insulation from questions about how juries actually decide."). Because we assume that juries follow the law as charged, because of our deep deference to the jury's collective judgment, and because Askew is provided protection from jury irrationality or error through an insufficiency of evidence challenge, *see Powell*, 469 U.S. at 67-68, we decline to resort to conjecture and assume, as Askew does, that the jury found Williams's testimony incredible. We are bound to include her testimony in our review of the evidence presented against Askew at trial, to which we now turn.

When evaluating a sufficiency of the evidence challenge, we view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution—a rigorous standard. *See United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004). We will affirm the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation omitted).

Conspicuously, Askew does not make the alternative argument that even considering Williams's testimony, the jury did not have sufficient evidence to convict on the conspiracy count. Because Askew does not challenge his conviction based on the record as a whole, but rather relies on a trial transcript figuratively excised of Williams's testimony, we could end our discussion of the sufficiency issue here. Yet, in the interest of completeness, we note that our review of the record, including Williams's testimony, satisfies us that the government presented the jury with sufficient evidence to establish Askew engaged in a conspiracy with Williams and Moore, not a mere buyer-seller relationship.

For Askew's conspiracy conviction to stand, the government needed to convince the jury that "(1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001). Proof of a drug distribution conspiracy, as opposed to a simple buyer-seller relationship, includes evidence of a prolonged and actively pursued course of sales, coupled with the defendant's knowledge of and shared stake in the illegal venture. *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001). A list of non-dispositive factors considered when assessing whether the alleged co-conspirators' association ripened into a conspiracy includes "whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit ('fronting'), and the quantity of drugs involved." *Hicks*, 368 F.3d at 805.

Here, Williams testified that she sold Askew PCP on Moore's behalf almost weekly for a year and a half, resulting in the exchange of thousands of grams of drugs. The transactions were regulated by Moore, sometimes at below-average prices or volume discounts, and sometimes paid in part by Askew, with the rest owing at the next purchase. From this and other evidence—including the phone recordings reflecting Askew's familiar relationship with Williams and

Moore, the pen register revealing his eighteen calls to Williams in a two-month period, Askew's close friendship with Moore that prompted him to help Askew "get back on his feet" after his financial woes, and Askew's signed confession admitting to at least one consummated PCP deal— a rational trier of fact could find that Askew and Williams engaged in more than a buyer-seller relationship. Indeed, a jury could conclude beyond a reasonable doubt that an agreement to distribute PCP existed among Moore, Williams, and Askew and that Askew willingly and intentionally joined in the agreement.

## B. Buyer-Seller Instruction

In line with his theory that the evidence established, at most, a buyer-seller relationship, Askew challenges the district judge's failure sua sponte to supply the jury with an instruction (a "buyer-seller instruction") explaining that repeated drug buys alone do not establish a conspiracy. Because Askew at no time requested a buyer-seller instruction or objected to its omission, we review the judge's failure to include such an instruction for plain error. *United States v. Gee*, 226 F.3d 885, 894 (7th Cir. 2000). To reverse a conviction under the plain error standard, we must find that (1) an error occurred; (2) it was "plain," meaning obvious or clear; (3) it affected Askew's substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Gibson*, 356 F.3d 761, 765-66 (7th Cir. 2004); *Gee*, 226 F.3d at 894-95. In other words, "[p]lain error must be of such a great magnitude that it probably changed the outcome of the trial." *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987).

Our finding above that the jury had sufficient evidence to convict Askew on the conspiracy count does not automa-

tically negate his claim that the judge committed plain error in failing to provide the jury with a buyer-seller instruction. *See, e.g., Gee*, 226 F.3d at 894-96 (finding that the jury had sufficient evidence to convict on the conspiracy charge, but reversing for failure to give a buyer-seller instruction); *United States v. Mims*, 92 F.3d 461, 466 (7th Cir. 1996) (finding ample evidence to support the conspiracy conviction, but reversing because the judge gave a flawed buyer-seller instruction). This is because the line between a buyer-seller relationship and a drug conspiracy can be a blurry one. In the former, the government seeks to punish the sale of the drugs alone; in the latter, it seeks to punish criminal objectives beyond the sale itself—most typically, the parties' agreement subsequently to distribute the drugs exchanged. *See United States v. Thomas*, 284 F.3d 746, 751-52 (7th Cir. 2002). Evidence of repeated sales can be used to establish both offenses, although in the case of a drug conspiracy, evidence of repeated sales alone is not enough to support a conviction. Rather, as already outlined above, in conspiracy cases the jury must assess a host of factors—including repeated sales—to determine whether an agreement beyond the simple purchase of drugs exists. Hence, we have found that "because the line between a conspiracy and a mere buyer-seller relationship is difficult to discern, district judges should instruct juries in appropriate situations on the distinction" and "inform juries that repeated transactions do not constitute a conspiracy." *Gee*, 226 F.3d at 895; *see also United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) ("[T]he jury should be told that *agreement*—the crime of conspiracy—cannot be equated with repeated transactions. This is the office of the buyer-seller instruction. It reminds juries that distribution of drugs is not itself conspiracy, although a history of transactions may be evidence of conspiracy.") (emphasis in original).

Askew argues that the district court committed plain error in failing to realize that the evidence in this case ne-

cessitated a buyer-seller instruction to ensure that the jury understood it could not convict on the conspiracy count solely on the basis of repeated drug buys. In evaluating his claim, we note that "[e]ach drug conspiracy case must be analyzed according to its specific facts to determine whether a buyer-seller instruction is appropriate." *Douglas*, 818 F.2d at 1321. "A defendant is entitled to a buyer-seller instruction only if the instruction has some foundation in the evidence." *Id.* In assessing the appropriateness of giving the instruction, we also consider whether Askew put forth a buyer-seller defense at trial. *Id.*; *see also United States v. Baker*, 40 F.3d 154, 162 (7th Cir. 1994).

We first examine the evidence Askew offered at trial. It is undisputed that Askew did not advance a buyer-seller defense during trial. Instead, Askew's strategy was to deny any involvement whatsoever with illegal drugs. When he testified in his own defense, he claimed to have been introduced to Williams by Moore, whom he barely knew, because Williams's nephew was interested in the rap music industry. He swore he never purchased or intended to purchase PCP from Williams, despite strong evidence suggesting otherwise, including: his signed confession admitting actual and intended purchases, the recorded phone conversations with Williams in which he made obvious attempts to purchase *something* (he says stereo speakers, she says PCP), and his arrest at the Homan Square rendezvous point carrying nearly $1200 in cash—enough to purchase the sixteen ounces of PCP offered by Williams for $1100 down with $200 owing.

Because Askew did not advance a buyer-seller theory of defense, his case is distinguishable from *Mims* and *Thomas*, two cases in which we reversed convictions based on missing or erroneous buyer-seller instructions. In both *Mims* and *Thomas*, the defendants' theories at trial were that they were drug dealers/buyers, not drug conspirators. *See Mims*, 92 F.3d at 463; *Thomas*, 150 F.3d at 744. They admitted their involvement in drug transactions, unlike Askew,

and they requested buyer-seller instructions, unlike Askew. *See Mims*, 92 F.3d at 463-64; *Thomas*, 150 F.3d at 744. We reversed when the district court gave a fatally flawed buyer-seller instruction that was different than the one requested by the defendant, *Mims*, 92 F.3d at 465-66, and when the district court refused to give the instruction at all, *Thomas*, 150 F.3d at 745-46. We also note that in both cases, the evidence against the defendants was weaker than that produced by the government here.

Although Askew's choice not to adopt a buyer-seller defense cuts in favor of finding no error in the district judge's decision not to give the instruction, we must still review the evidence presented by the government to determine whether it was such that a jury could confuse a buyer-seller relationship with a conspiratorial one. For example, in *Gee*, we determined that the district court committed plain error when it failed to give the buyer-seller instruction sua sponte because the court had explicitly recognized that the conspiracy evidence against the defendants was weak. 226 F.3d at 895. There, the district court refused to admit the government's proffered co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), finding that the government had not shown by a preponderance of the evidence that a conspiracy existed between the defendants. *Id.* at 895 n.8. Because of this, we reasoned, "[t]he district judge's reservation about the proof of a conspiracy should have alerted him to be certain that the jury correctly evaluated the evidence before determining whether a conspiracy existed." *Id.* at 895.

No similar reservations were expressed by the district judge here, and rightly so, in light of the evidence presented at trial. As already noted, Williams testified to almost weekly sales of large quantities of PCP over a year-and-a-half period, during which time she, at Moore's behest, regularly "fronted" Askew portions of the purchase. Moore agreed to let Williams sell him large quantities of PCP at wholesale

prices so that Askew "could get back on his feet." The logical inference to be drawn from this evidence was that all three agreed that Askew would purchase drugs from Moore through Williams so that Askew could redistribute it at a profit. This enabled Askew to pay off the amounts fronted to him and "get back on his feet"; the arrangement also provided a steady demand for Moore's product. Such facts indicate a conspiracy, not a simple buyer-seller relationship. The strength of the government's case, combined with Askew's choice not to present or argue any evidence tending to show he was involved in a buyer-seller relationship only, leads us to conclude that there was no clear error in not sua sponte giving a buyer-seller instruction. *See Baker*, 40 F.3d at 162 (finding no error in refusing to give a theory of defense instruction where nothing in evidence supported the defense); *United States v. Fort*, 998 F.2d 542, 547 (7th Cir. 1993) (finding no error in not giving a buyer-seller instruction when the defendant chose to portray himself as a mere bystander rather than a drug buyer because such an instruction would have been inconsistent with his defense).

Moreover, considering the relative strength of the evidence against Askew, we do not believe giving the instruction would have changed the outcome of the trial, as required under plain error review. The absence of that instruction, therefore, did not affect Askew's substantial rights and does not warrant reversal.

## C.  Judge's Response to Jury Questions

Askew also argues that the court, in response to written questions forwarded by the jury during deliberations, failed properly to supplement the jury instructions and make it clear that events taking place after Williams agreed to co-operate with the government could not be considered part

of the conspiracy agreement.[2] But Askew has waived any such objections because he explicitly agreed to the proposed response to the jury's first set of questions and, as to the final questions posed by the jury, he actually suggested the response provided by the court. *See United States v. Lakich*, 23 F.3d 1203, 1208 (7th Cir. 1994) (finding defendant waived any argument that the court's supplemental instruction was erroneous because his attorney specifically stated that he agreed to the instruction); *see also United States v. Sensmeier*, 361 F.3d 982, 986 (7th Cir. 2004) ("Waiver is the intentional relinquishment or abandonment of a known right, representing the manifestation of an intentional choice[.]") (internal quotations and citations omitted).

As reflected by the trial transcript, the jury first asked the following questions, among others:

[I]n considering the quantity of drugs involved in an alleged conspiracy, are we to consider evidence of transactions prior to the Jan. 9 arrest of Askew?

\* \* \*

The jury wants to know if it should consider evidence up to and including the events of Jan. 9 in reaching a

---

[2] Although a conspiracy terminates when one member agrees to cooperate with the government, *Thomas*, 284 F.3d at 754 (noting that if a party's goal is "not to commit a crime but to expose one, there [can] be no genuine agreement" supporting a conspiracy conviction), "one might still look to later events for clues about what the nature of the relationship between [the alleged co-conspirators] was prior to that date." *Id.* at 755. Thus, the jury was entitled to consider the phone calls between Askew and Williams setting up the January 9, 2002, buy and the events surrounding Askew's arrest to clarify Askew and Williams's relationship prior to those events. The jury was not permitted, though, to use those events to establish the elements of the conspiracy charge.

conclusion about the count one conspiracy, or does count one only deal with evidence prior to those events?

The judge consulted with the attorneys about the appropriate response. During that conference, Askew's attorney stressed, "[M]y position is you should simply say to read the indictment and the instructions. I think you are getting into a place where you are telling them what to do other than just read the instructions and read the indictment, and I think that's the Court putting itself in the process." (Tr. at 361.) After further discussion, the judge stated: "I suppose one other thing we can say is[,] 'As to your other questions, you may consider whatever evidence you think is appropriate.'" (Tr. at 361.) The government agreed. Askew's attorney stated, "All right," to which the judge responded, "That would be alright?" Askew's attorney answered, "Yes." (Tr. at 362.) The judge then wrote the jury with the following response: "Thank you for your notes. . . . With regard to your remaining questions, you may consider whatever evidence you think is appropriate."

The final questions asked by the jury were as follows:

Does count one conspiracy charge apply <u>only</u> to the period of "beginning in or about 2000 and continuing on or about Dec. 16, 2000" as outlined in the indictment?

In deciding whether the defendant is guilty of count 1, should the jury consider the events and evidence after Dec. 16—or should the jury consider events and evidence only up to Dec. 16 and not beyond? [emphasis in original]

Askew's attorney suggested the following response: "Just reread the conspiracy instruction. You should tell them that." The judge responded, "Okay," (Tr. at 370), and delivered the following message to the jury: "In response to your question, please reread the conspiracy instruction in your jury instructions."

Considering his conduct during the conferences with the judge discussing the appropriate response to the jury's questions, Askew has no basis for appeal now.[3]

## D. Evidence Suppression

Askew argues that the $1189 seized after he was stopped and searched by the FBI outside the Homan Street Theater and the confession procured after his arrest should have been suppressed because the initial stop was a seizure that violated the Fourth Amendment. He states that the stop, in which FBI agents blocked his vehicle with theirs and ordered him out of the car with weapons drawn, constituted a full arrest unsupported by probable cause. In the alternative, he argues that if the actions of the FBI can be characterized as a *Terry* investigative stop, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968), the FBI did not have reasonable suspicion to perform the stop. We note at the outset that Askew failed to challenge the FBI's actions and the evidence discovered before the district judge. Thus, we review the district court's admission of the evidence for plain error only. *United States v. Kincaid*, 212 F.3d 1025, 1030 (7th Cir. 2000). Again, "[p]lain

---

[3] We also note that at no time did Askew make the argument he makes here, that the conspiracy instruction as originally given by the court was inadequate, lacking clarification as to Williams's status as a government informant after her arrest and to its significance in terms of the conspiracy charge. By taking the position, in response to the jury's questions, that the judge should direct the jury to the conspiracy instruction already provided and by requesting no clarifying language, Askew implicitly accepted the conspiracy instruction as a complete and accurate statement of the law. Thus, not only has he waived the argument that the district judge failed to provide appropriate supplemental instruction to the jury, he has effectively waived the related argument that the conspiracy instruction with which the jury was initially charged was flawed in such a way as to warrant a new trial.

error review allows us to correct only particularly egregious errors for purposes of preventing a miscarriage of justice." *Id.* (quotations omitted).

Under our Fourth Amendment jurisprudence, citizens can be subjected to a full custodial arrest only if the arresting officer has probable cause to detain them. "Probable cause to arrest exists when a reasonably cautious and prudent person would be justified in believing that the individual to be arrested had committed, was committing or was about to commit a crime." *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)).

In addition, precedent teaches that law enforcement officers may engage in brief investigative stops that need not be supported by probable cause, but instead by reasonable suspicion that the target has committed, is committing, or is about to commit a crime. *See Terry*, 392 U.S. at 26; *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999) ("Since the Supreme Court's decision in *Terry*, it has been established that a law enforcement officer may conduct a brief, non-intrusive detention of a person if the officer has specific and articulable facts sufficient to give rise to a reasonable suspicion that the person had committed or is committing a crime.") (citations omitted).

The line between a lawful *Terry* stop and an unlawful arrest is not bright, *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (citing *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir. 1993)), especially since we have "witnessed a multifaceted expansion of *Terry*. . . . For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *Tilmon*, 19 F.3d at 1224-25 (internal quotations and citation omitted).

Based on the facts presented here, we find that the FBI executed a constitutional *Terry* stop—not an arrest—in the Homan Square Theater parking lot, even though the agents blockaded Askew's car and approached with guns drawn. The agents' show of force corresponded to their reasonable suspicion that one of the people in the silver Hyundai was Askew, who was preparing to commit a drug-related crime. As we explain below, the inherent danger in stopping those suspected of drug trafficking, for which guns are known tools of the trade, in a public place where civilian lives might be at risk, warranted the level of intrusion in this instance.

### 1. Reasonable suspicion

A finding of reasonable suspicion supporting a *Terry* stop must be based on the totality of the circumstances presented to the officer at the time of the detention. *Scheets*, 188 F.3d at 837. "[T]he 'totality of the circumstances' encompasses both 'the experience of the law enforcement agent and the behavior and characteristics of the suspect.'" *Id.* (quoting *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995)). Askew argues that his behavior the day of the stop could not reasonably have alerted the officers that he, out of all the people in the strip mall parking lot, was the individual about to purchase PCP from Williams. He characterizes his behavior as described by the FBI—riding in a car slowly circling the lot—as innocently looking for a parking space, like the many other patrons of Homan Square. He also points out that although he told Williams he would be arriving in a white Cadillac, he switched cars and was a passenger in a car of a completely different make, model, and color.

Yet Agent Benvenuto, the FBI agent in charge of the stop, testified that he received information from Williams, a cooperating witness, that Askew was to arrive at the theater at 11:00 A.M. for the purpose of making a PCP buy.

While waiting for Askew to arrive, Agent Benvenuto was in contact with Williams's case agents, who were updating him as to Askew's whereabouts based on Williams's contemporaneous phone conversations with Askew. From these communications, Agent Benvenuto knew when Askew's arrival was imminent and that he was in a car, although not the white Cadillac that Askew originally claimed he would be driving. Agent Benvenuto, who was assigned to investigate drug trafficking organizations, explained his decision to stop the Hyundai Accent: "It has been [my] experience that when you arrange a buy-bust for a certain location and then a car arrives at that location driving in what I would describe as a suspicious manner, clearly looking for someone in that parking lot, it's been my experience that that is the individual." (Tr. at 114.)

The totality of the circumstances here firmly establishes reasonable suspicion, if not probable cause, for the stop. Although circling a parking lot looking for someone is most certainly an innocent act, we have acknowledged that "a pattern of behavior interpreted by the untrained observer as innocent may justify a valid investigatory stop when viewed collectively by experienced drug enforcement agents like [Agent Benvenuto]." *United States v. Lechuga*, 925 F.2d 1035, 1039 (7th Cir. 1991) (quotation and citations omitted). This is especially true, where, as here, the FBI were alerted to Askew's intent to commit a crime at the Homan Street Theater by a trusted informant, Williams. *Id.* ("Taken together, the facts observed by [the officer], especially when viewed in light of the prior tip he had received from a trusted informant, amply suffice to establish reasonable suspicion for the stop of [the defendant's] car.").

### 2. Degree of intrusion

Having decided that the initial stop was justified under *Terry*, we must examine whether the manner in which it

was executed—car blocked, guns drawn—was "reasonably related in scope to the circumstances which justified the interference in the first place." *Vega*, 72 F.3d at 515 (quotation omitted). "We . . . have recognized that, because investigative detentions often pose a great risk of harm to the police, the 'mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety.'" *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004) (quoting *Tilmon*, 19 F.3d at 1226).

Drug arrests can warrant intrusive tactics because of their inherent danger. "Guns are among the tools of the drug trade[,]" *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000), and, thus, "[a]llowing police to draw their weapons may be reasonable if the suspect . . . is thought to be involved in criminal activity in which the use of weapons is commonplace," *Tilmon*, 19 F.3d at 1227 (quotation omitted). Here, the FBI and the police assisting on the arrest believed Askew to be part of a large PCP distribution ring. The arrest took place late morning in a busy strip-mall parking lot. Any attempt Askew might make to flee in the car or to use weapons to aid in escape had the potential to harm large numbers of innocent bystanders or the law enforcement officers attempting to execute the arrest. Therefore, the FBI acted reasonably in neutralizing Askew by surrounding his car and approaching with weapons drawn. *See, e.g.*, *Vega*, 72 F.3d at 515 ("The agents who stopped and questioned [the defendant] believed that he was involved in a massive cocaine importation conspiracy. They had every reason to believe that he was dangerous. Certainly it was reasonable for the agents to have their weapons drawn upon their initial contact."); *Lechuga*, 925 F.2d at 1040 (noting the expansion of *Terry* to include circumstances where weapons are drawn and vehicles are blocked in order to effectuate the stop) (collecting authority).

We find the *Terry* stop lawful based on the particular circumstances of this case and, therefore, the judge did not commit any error, plain or otherwise, in allowing evidence collected as a result of the stop to be presented to the jury.

### E.  Askew's Sentence

One final matter we must address is the effect of the recent Court decision in *United States v. Booker*, 125 S. Ct. 738 (2005), on Askew's sentence. In *Booker*, the Court reaffirmed the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and extended its principles to the federal Sentencing Guidelines, holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. In its remedial holding, the Court excised the mandatory provisions of the Guidelines. *See id.* at 757. As a result, district courts now have the discretion to sentence outside the ranges set in the Guidelines, and we review these sentences for reasonableness. *See id.* at 765-66.

Askew failed to raise in the district court an *Apprendi*-based objection to his sentence, but following argument, we granted Askew leave to file a supplemental brief raising such a challenge in light of *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004). Accordingly, we review for plain error. As discussed earlier, "[u]nder [the plain error] test, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (citation and internal quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error,

but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The record discloses that Askew received a sentence mandated by the Guidelines and increased on the basis of facts found by the judge, not the jury—in other words, Askew's sentence was imposed under a sentencing scheme that we now know is unconstitutional. Askew's sentence, therefore, was imposed in error, and the error is plain. *See United States v. Paladino*, No. 03-2296, 2005 WL 435430, at *7 (7th Cir. Feb. 25, 2005). We cannot determine, however, whether Askew would have received the same sentence had the district court been free to exercise the broad sentencing discretion now afforded in the wake of *Booker*. In short, we are unable to resolve whether Askew's substantial rights were affected when he received a sentence imposed under the mandatory Guidelines regime.

As we concluded in *Paladino*, the "only practical way . . . to determine whether the kind of plain error argued in these cases has actually occurred is to ask the district judge." *Paladino*, 2005 WL 435430, at *10. To that end, we "order a limited remand to permit the sentencing judge to determine whether he would . . . reimpose his original sentence." *Id.* If the district court determines that Askew would have received the same sentence, we will conclude that Askew was not prejudiced, and his plain error challenge must fail. We will then affirm the original sentence, provided it is reasonable. *See id.* (citing *Booker*, 125 S. Ct. at 765).

On the other hand, if the district court decides that a different sentence would have been appropriate pursuant to its exercise of greater discretion, "we will vacate the original sentence and remand for resentencing." *Paladino*, 2005 WL 435430, at *10. Regardless of whether the district court decides to resentence Askew, the court should abide by the process we set forth in *Paladino* to provide an appropriate explanation for its decision. *See id.*

### III.  Conclusion

Because we find no merit in any of the arguments Askew raises on appeal, his conviction is AFFIRMED. As to Askew's sentence, however, we order a limited remand of this case in accordance with the remedial procedure adopted by this circuit in *Paladino*. The district court is directed to return this case to us at the completion of its sentencing determination, pursuant to the procedure set forth in *Paladino*.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*