In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1466, 08-1608, 08-1616 & 08-1617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAREK HAYNES, BRODERICK JONES,
EURAL BLACK, and BRENT TERRY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cr-70—**Ronald A. Guzmán**, *Judge.*

ARGUED JUNE 5, 2009—DECIDED SEPTEMBER 17, 2009

Before POSNER, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Crime is a risky business. One
of the risks is that you will get caught. That happened to
Darek Haynes, Broderick Jones, Eural Black, and Brent
Terry. They were charged with a drug conspiracy, a
robbery and extortion conspiracy, and related offenses.
Haynes, Jones, and Black also were charged with a racke-
teering conspiracy. Haynes and Jones pled guilty. Black

and Terry were tried by a jury and convicted. These defendants appeal, raising several issues. Finding no error, we affirm.

## I. Background

The following facts are taken from the evidence viewed in the light most favorable to the government with all reasonable inferences drawn in the government's favor, as we must.[1] The defendants were involved in a criminal enterprise that included bad cops and drug dealers in Chicago, Illinois, beginning as early as 1999 and continuing into 2005. The drug dealers in the enterprise provided the corrupt cops with information about the location of narcotics and money held by other drug dealers. The corrupt officers used that information to conduct traffic stops and home invasions and seize any drugs and money they found. The cops then sold the drugs with the help of the drug dealers, and the coconspirators divided the proceeds. None of this was legitimate law enforcement activity.

The leader of the conspiracy was defendant Broderick Jones, then a Chicago police officer. Someone in the

---

[1] As you read this, it may be difficult to tell the cops from the crooks. That's because many of the actors in these events are both. You may be reminded of a popular movie released in 2001, *Training Day*, featuring Denzel Washington's Oscar-winning portrayal of the ultimate corrupt cop. *See* http://trainingday.warnerbros.com (last visited Sept. 4, 2009). In our case, life imitates art.

Chicago Police Department (CPD) management must have had suspicions about him because on August 22, 2003, Jones was informed by the CPD that he was no longer authorized to exercise police authority and was being placed on "restricted duty" pending an investigation into his conduct. He had to surrender his CPD star, shield, and ID card, and was ordered not to carry a firearm or any other weapon, not to exercise his police powers, and not to drive a CPD motor vehicle without authorization.

In the summer of 2004, Jones called his former police partner, Erik Johnson, and asked for his assistance in ripping off a drug dealer. At the time of Jones's call, Johnson was on duty with his new CPD partner, defendant Eural Black, patrolling in Johnson's unmarked police cruiser. Johnson agreed to meet Jones at the intersection of 87th Street and Lafayette Avenue to discuss the ripoff. When Black and Johnson met Jones, he told them that a drug courier would be driving by shortly and that he wanted them to stop the car and seize any narcotics they found. Jones would sell the drugs and give Johnson and Black between $8,000 and $10,000. Black and Johnson discussed Jones's proposal and agreed to participate. Once they told Jones that they would join in, Jones called someone on his cell phone. Then the three cops waited for several hours for the drug courier, but he didn't show. Since it was approaching the end of their shift, Black and Johnson left.

A few weeks later, Jones again called Johnson while Johnson was on duty patrolling with Black in his CPD

cruiser. Jones asked Johnson to meet him at the intersection of 87th Street and Lafayette Avenue, the same location where they had met before. Johnson told Black that Jones wanted to meet with them again, and they drove to the intersection where they met Jones. Jones advised them that a drug courier would be driving through the neighborhood and that he wanted them to pull him over, search his vehicle, and seize any narcotics found. He again offered to pay Johnson and Black between $8,000 and $10,000 for their assistance. Johnson understood that they would be paid from the sale of any drugs seized during their traffic stop of the drug courier.

Black and Johnson agreed to join in the ripoff. Jones got into the back of the police cruiser and they drove to the intersection of 91st Street and Indiana Avenue where they waited for the drug courier. Jones said that the courier would be a Hispanic male driving a red sport utility vehicle (SUV). Soon enough, a Hispanic male driving a red SUV appeared. Johnson pulled behind the SUV, activated his cruiser's siren and lights, and ordered the driver to pull over. The driver complied. Jones, Johnson, and Black exited the police cruiser and approached the SUV. Jones pulled the driver out and patted him down. Black handcuffed the driver and placed him in the police cruiser. Then Jones searched the SUV. When he had completed his search, the officers released the driver. Johnson didn't see Jones remove any drugs from the SUV, but when Johnson returned to the cruiser after the search, he saw an empty cardboard box inside that hadn't been there before. According to

Johnson, the box was large enough to contain a one-kilogram brick of cocaine.

Jones, Johnson, and Black returned to 91st and Indiana, where Jones had left his personal vehicle. Jones advised the other two that he would call them in a while to inform them when and where they could meet him for payment. That evening, Jones called Johnson and the three arranged to meet. When they met that night, Jones gave Johnson a large bag of money. Black and Johnson went to Johnson's house, counted the money, $12,000, and split it between themselves.

On July 21, 2004, Jones called Johnson a third time, offering him another chance to participate in ripping off a drug courier. Again, Johnson was on duty with Black and in his CPD cruiser. Johnson told Black about Jones's offer, and Black agreed to participate, saying that he needed the cash. This time they met Jones at 87th Street and Ashland Avenue where Jones told them that a Hispanic male in a black Chevy Blazer SUV would be driving northbound on Ashland that afternoon. Jones said the male was a drug courier and that Jones wanted them to pull him over, search his vehicle, and seize any drugs inside. Jones gave Johnson a Nextel cell phone with a "Direct Connect" walkie talkie feature so they could communicate and told them to wait on Ashland. A while later, Jones called Johnson on the Nextel phone and told him that the Blazer was approaching. The Blazer passed Black and Johnson, and Johnson pulled out, activated his lights and siren, and pulled the SUV over.

Black and Johnson exited the cruiser and approached the Blazer. Both of them were wearing their normal tactical gear and their guns. Johnson removed the driver from the Blazer and patted him down.[2] Black handcuffed him and placed him in the police cruiser. By then Jones had parked his own vehicle a few car lengths behind the cruiser. Johnson searched the Blazer, receiving specific instructions from Jones through Direct Connect about where to look. Johnson, however, didn't find any drugs. Johnson and Black released the driver and then met Jones a few blocks away to discuss the failed ripoff attempt. Jones, Black, and Johnson were photographed

---

[2] In an ironic twist of fate, the driver was a confidential informant (CI) working with the CPD in a legitimate drug investigation. As part of that investigation, legitimate narcotics officers were using the CI to broker a sale of cocaine to Joseph Wilson, the owner of a car wash in the 8500 block of South Ashland Avenue who was involved in drug dealing. Though the CPD had been suspicious of Jones's activities, it does not appear that the CPD had specific information regarding Jones's and his cohorts' illegal activities that day. However, earlier in the day, some CPD officers working with the CI had observed a suspected drug courier being followed by Jones in his personal vehicle and CPD officers defendant Darek Haynes and Corey Flagg in an unmarked police cruiser. When Haynes and Flagg pulled over the courier and searched his car, the CPD officers knew something was up—neither Jones, Haynes, nor Flagg was participating in the narcotics investigation and all of them were outside of their assigned district. The officers contacted the CPD's Internal Affairs Division, which contacted the FBI. The jig was just about up for our bold defendants.

during the stop by legitimate CPD officers. These photographs were introduced into evidence at trial.

The government obtained telephone records from July 21, 2004, for calls made between phones registered to the CI, Jones, Johnson, and other CPD officers known to Jones. The records showed that six calls were made that morning and afternoon between Jones's cell phone and a cell phone registered to Defendant Brent Terry. Several of those calls were placed within two minutes of a call between Jones's phone and a phone registered or used by one of the other officers known to Jones. A summary of these telephone calls was introduced into evidence at trial.

Within a few days of the July 21 attempted ripoff, the government obtained a wire tap on Joseph Wilson's phone. A few weeks later, the government obtained a wire tap on one of Jones's cell phones. The wire taps provided a good deal of evidence of Jones's planned ripoffs of drug dealers and use of corrupt police officers to make the ripoffs appear to be legitimate police work.

Early in September, Jones devised a plan to search the home of Jerry Montgomery, whom Jones knew to be a drug dealer, and steal his cocaine and money. Jerry[3] knew Jones, so Jones needed another officer to execute the search. Corey Flagg, another former CPD partner of Jones, agreed to play that role. Jones thought Flagg

---

[3] Jerry's brother, Joel Montgomery, makes his way into this opinion as well; thus, to avoid confusion, we will refer to each of them by their first name.

would need another officer along, so Jones attempted to contact other officers he knew from the Seventh District to ask them to participate. Jones asked for Black, but Black was off duty that day. Jones eventually reached defendant Darek Haynes who agreed to participate in ripping off Jerry.

On September 8, 2004, Flagg and Haynes unlawfully entered the building where Jerry lived. Their plans were thwarted, however. A neighbor downstairs confronted them, and Flagg feared he might call the CPD to complain. So Haynes left the scene and Flagg called his sergeant and other officers to make things look legitimate. When the other officers arrived, Flagg had to inventory the drugs and weapons found and had Jerry arrested. Jerry attempted to get released by telling the arresting officers that he knew Jones. Flagg let Jerry call Jones, and Jerry pleaded with Jones to be released.

Jones called Terry, explaining that Jerry had been arrested by one of Jones's associates and had been throwing Jones's name around. Jones told Terry that Jerry would have been released had he bribed the associate, but Jerry didn't have any cash. Terry called Jones later that evening and asked whether it was still possible to get Jerry out. But Jones said it was too late for that.

Jones didn't obtain any drugs or cash from Jerry's house, but he did discover some good information. Jones learned that Jerry's drug source was Jerry's girlfriend, Marie Townsend, and that she continued to run Jerry's drug business while he was detained on the charges arising from the invasion of his home. So, Jones

formulated a plan to rip off Townsend. The day after the failed home invasion, Jones called Terry and informed him that Jerry's source was his girlfriend. Terry said that he knew the girlfriend and would try to find a way to contact her. He had a tough time contacting Townsend, though.

So, on September 22, 2004, Jones called Jerry's estranged brother, Joel, and told him that Jones's "buddy B" wanted to get in touch with Jerry's girlfriend. ("B" was a nickname Jones used for Terry.) Joel said that Townsend had Jerry's cell phone while Jerry was in jail and that "B" should try Jerry's number. Joel indicated that Townsend had been taking calls on Jerry's cell phone from Jerry's associates and would often ask Joel whether the associate could be trusted. Joel offered to vouch for "B" if Townsend asked.

Jones and Joel discussed the planned transaction with Townsend, including the number of kilograms "B" should order from her. Jones asked if Townsend could handle a "dub," meaning twenty kilograms, and Joel said he thought so. But, he added, if "B" asked for a "dub" that might "spook" Townsend and she might want to bring someone else with her to the transaction. Thus, Joel recommended that "B" ask for less than a "dub," more like five to ten kilograms. Immediately after the call with Joel, Jones called Terry and advised him that Joel suggested that Terry call Jerry's phone to reach Townsend.

On September 24, Terry called Jones and reported that he was "supposed to meet up with old girl in a little

bit" and he would call Jones back later. Jones immediately called Flagg, saying "My buddy B, you know my buddy B? He about to hook up with old girl and then . . . he going to know something for me, and . . . I'll hit you later." A few days later, on September 27, Jones met with Flagg to discuss the plan to rip off Townsend. Jones told Flagg that his buddy "B" would meet with Townsend and try to buy ten kilograms of cocaine. Jones also told Flagg that when the drugs arrived at the meeting site, "B" would call Jones and say, "bring the money," which was a signal for Jones and Flagg to come to the scene, seize the drugs, and pretend to arrest "B."

That evening, Terry gave the signal. So Jones and Flagg drove in Flagg's unmarked CPD cruiser to a parking lot near the intersection of 87th Street and Wabash Avenue. Upon arrival, they saw Terry and Townsend in Townsend's car. Flagg was wearing his CPD badge and handgun. Jones and Flagg removed Terry and Townsend from the car, handcuffed them, and placed them in the cruiser. Jones seized a bag from the car and put it in the trunk of the cruiser. Then Jones and Flagg released Townsend. Jones, Flagg, and Terry drove to Flagg's house where they opened the bag that had been removed from Townsend's car. Inside, Flagg observed two brick-shaped packages that he believed, based on his experience, were two kilograms of cocaine. He also saw several other brick-shaped objects beneath the two packages and believed they were cocaine as well. Based on his observations and the size of the bag, Flagg believed that the bag contained ten kilograms of cocaine. Jones called a third person to say he was on his way,

and then Jones and Terry departed with the cocaine. Later in the evening, Jones returned to Flagg's house. Jones told Flagg that he kept five kilograms of cocaine and gave "B" five. Jones gave Flagg between $10,000 and $12,000, which Flagg understood came from the sale of the cocaine. Flagg eventually received a total of $21,000 to $25,000 for his role in the Townsend ripoff.

On October 15, 2004, Jerry was released from detention. Within a few weeks, he was pulled over by CPD officers who called Flagg to the scene. When Flagg arrived, Jerry revealed his suspicion that the stop of Townsend and Terry was not legitimate. Flagg called Jones from the scene to relay this to him. Later that month, Jones called Terry to inform him that Jerry might be on to them. Jones admitted that he was a bit worried, but he was going to meet with his "buddy" who would "tell [him] everything." After Jones talked to his "buddy," he called Terry to say that he thought Jerry knew that Townsend's arrest was a scam. Jones also told Terry that Jerry had mentioned Terry's name.

On November 13, 2004, Jones and James Walker agreed to rip off a Mexican drug supplier. According to Jones's plan, Walker would invite the supplier to bring drugs to the car wash at the intersection of 85th and Ashland and would back out at the last minute. Then, when the supplier left the car wash, Jones and other crooked cops would stop him, seize the drugs, and let him go. Jones tried feverishly to contact officers to assist in the ripoff. He tried to reach Black, but got his voice mail. Later that afternoon, Black returned Jones's call, and Jones

said that he "might have something for you." Black responded, "Call me man." Jones replied, "Okay . . . just stay around for a minute, I got to make a call real quick." Black asked where he should go, and Jones instructed, "it's gonna be over there where we was last time by the car wash . . . 85th and Ashland." Black told Jones, "I'm heading that way." Jones called Black again and advised that "we waiting for him to call back." Black said he was on his way. That afternoon, law enforcement agents, conducting surveillance in the vicinity of the car wash at 8540 S. Ashland Avenue, observed Black's CPD cruiser parked in a parking lot near the intersection of 87th and Ashland with two black males inside. Nothing came of the planned ripoff of the Mexican drug supplier.

A few hours later, Jones and Terry spoke by phone. Jones said he was at the intersection of 85th and Ashland and had "just tried to do something," but it "didn't go through." Jones said that he "was going to come at you tonight too, but . . . it ain't followed through so we'll see what happens in the morning." Jones and Terry talked on the phone again on November 23, 2004, when Jones stated, "I need another demo." Terry replied, "I've been trying to work on some s— too though. . . . [W]e got to get up, link up together this week for sure."

Haynes, Jones, Black, Terry were charged with a drug conspiracy involving five kilograms or more of mixtures containing cocaine and quantities of marijuana and a robbery and extortion conspiracy in violation of 21 U.S.C. § 846 and 18 U.S.C. § 1951. Haynes, Jones, and Black also were charged with a racketeering conspiracy

in violation of 18 U.S.C. § 1962(d). All four were charged with related drug and robbery and extortion offenses and one or more firearms offenses under 18 U.S.C. § 924(c). Haynes pled guilty and was sentenced to 168 months on the conspiracy convictions and a consecutive 60-month sentence on the § 924(c) conviction for a total of 228 months. Jones pled guilty and was sentenced to 240 months on the conspiracy counts and a consecutive 60-month sentence on the firearm conviction for a total of 300 months. Black and Terry were tried by a jury and convicted as charged. Black was sentenced to 480 months' imprisonment. Terry was sentenced to 168 months for the substantive drug conspiracies and a 60-month consecutive sentence on the § 924(c) conviction for a total of 228 months. These appeals followed.

## II. Discussion

Black and Terry claim that the trial evidence was insufficient to support their conspiracy convictions, resulting in a fatal variance between the conspiracy charged and the conspiracy proved at trial. They also challenge the sufficiency of the evidence to support their § 924(c) convictions. Terry argues that there was insufficient evidence to prove that he possessed five kilograms of cocaine and that a recorded conversation between Jones and Ricky Dee (who was not charged in the indictment) was erroneously admitted as a coconspirator statement under Fed. R. Evid. 801(d)(2)(E). Haynes challenges the district court's decision not to give him a minor role reduction under U.S.S.G. § 3B1.2(b) and its application of

a four-level enhancement under U.S.S.G. § 3B1.5(2)(B) for his use of body armor. He also challenges the imposition of a consecutive five-year sentence for his firearm conviction. Jones argues that the district court erred in applying the use of body armor enhancement because it also applied an enhancement for abuse of a position of trust. We will address each of these claims in turn, starting with the challenges to the proof at trial.

## A.  Trial Issues

### 1.  Black and Terry: Conspiracy Variance

Black and Terry first complain that there was a fatal variance between the conspiracy charged in the indictment and the conspiracy proved at trial.[4] A fatal variance exists "when the facts proved at trial differ from those alleged in the indictment." *United States v. Dean*, No. 08-3287, 2009 WL 2341676, at *4 (7th Cir. Aug. 5, 2009) (quoting *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009)). To prove a conspiracy variance claim, a defendant must establish that "the evidence at trial did not support the jury's finding that he joined the charged conspiracy" and that this caused him prejudice. *Id.* A conspiracy variance claim is a challenge to the sufficiency of the evidence, *see United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009), which is reviewed under a highly deferential standard, *United States v. Womack*,

---

[4] Terry has adopted Black's conspiracy variance and hub-and-spoke conspiracy arguments and vice versa.

496 F.3d 791, 794 (7th Cir. 2007). Viewing the evidence and drawing all reasonable inferences in the light most favorable to the government, we consider whether the evidence is sufficient to support the jury's verdict. *See Dean*, 2009 WL 2341676, at *4. We will "'overturn a conviction only if the record contains no evidence from which a reasonable juror could have found the defendant guilty.'" *Id.* (quoting *Longstreet*, 567 F.3d at 918). As we have often observed, a defendant faces a "nearly insurmountable" hurdle when challenging the sufficiency of the evidence. *See, e.g.*, *United States v. Hensley*, 574 F.3d 384, 390 (7th Cir. 2009) (quotation omitted).

Neither Black nor Terry raised a conspiracy variance claim in the district court, so their burden is even heavier; we review for plain error only.[5] *See Womack*, 496 F.3d at 794. We find plain error if an error occurred, the

---

[5] Black's opening brief conceded that the defendants did not make a rimless hub-and-spoke conspiracy argument and did not request a multiple conspiracies instruction and, therefore, that these matters are reviewed for plain error. However, Black's reply brief asserts that his position on the standard of review may have been incorrect because his motion for a new trial challenged the sufficiency of the evidence. We think Black was right the first time. We have reviewed his motion for a new trial and, while it challenges the sufficiency of the evidence, there is no mention of proof of a rimless hub-and-spoke conspiracy or the lack of a multiple conspiracies instruction. Thus, we review for plain error. *See United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006). But even if we were to review these issues under the more stringent de novo standard, the result would be the same.

error was plain, and the error affected the defendant's substantial rights. *Id.* Thus, our task is to determine whether the record contains evidence from which a reasonable juror could have found Black and Terry guilty of the conspiracies charged in the indictment.

To prove a drug or Hobbs Act conspiracy, the government must establish that two or more persons agreed to commit an unlawful act, and that the defendant knowingly and intentionally joined in the agreement. *Avila*, 557 F.3d at 814. Two or more persons conspired together if they "embraced a common criminal objective, even if they did not know each other or participate in every aspect of the crime." *Id.* (quotation omitted); *see also Longstreet*, 567 F.3d at 919. The government may prove an agreement among coconspirators by circumstantial evidence. *Avila*, 557 F.3d at 816. However, two persons have not conspired together "when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *Id.* at 814 (quotation omitted). This often comes up in a "hub-and-spoke" conspiracy, where the core conspirator is connected to each of the coconspirators by a "spoke." *Id.* To prove a single conspiracy in the hub-and-spoke context, the government must establish that a "rim" connects the spokes together; "otherwise the conspiracy is not one but many." *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007). "This 'rim' is an agreement to further a single design or purpose." *Avila*, 557 F.3d at 814. For a single conspiracy to exist, the conspirators "who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *Bustamante*, 493 F.3d at 885 (quotation omitted).

Black and Terry contend that the government's evidence established a rimless hub-and-spoke conspiracy. Black claims that he was involved in only four ripoffs or attempted ripoffs. Terry asserts that the evidence proved that he was involved in just the Townsend ripoff. They claim that the government presented no evidence that they were aware of any other criminal activities involving the other alleged coconspirators or that they intended to further the wide conspiracy charged in the indictment. We, however, find no variance with respect to the proof against either Black or Terry.

As for Black, the evidence established that he was aware that others were assisting him and Jones in the ripoffs and attempted ripoffs. The evidence was that Black agreed with Jones and Erik Johnson to participate in three ripoffs of drug dealers. Jones would relay information to Black and Johnson about the drug courier—what type and color vehicle he would be driving, his gender and ethnicity, and where he would be driving. Jones's information usually panned out. It would be reasonable for a jury to infer that Black must have known that Jones was getting what proved to be very accurate inside information from someone who was also involved in the ripoff. And once Black and Johnson agreed to participate in the first attempted ripoff, Jones called someone in their presence. This evidence supports a reasonable inference that the person Jones called was involved in the ripoff and that Black was aware of that person's involvement.

Furthermore, after the first successful ripoff, Jones didn't pay Black and Johnson immediately, but instead told them that he'd be in touch regarding payment. This reasonably suggests that Jones had to have another conspirator sell the drugs to get the cash to pay Black and Johnson. The wiretap evidence also supports the finding that Black was aware that Jones was working with other conspirators in setting up the ripoffs. In a November 13 call, after Black had agreed to participate in yet another ripoff, Jones instructed him to "stay around for a minute, I got to make a call real quick," and then called Black back and advised, "we waiting for him to call back." These statements made directly to Black convey that Jones wasn't working alone in setting up the ripoff.

The recorded conversations also support a finding that Terry was aware that Jones was working with other bad cops. Take, for example, the recorded conversations shortly after Jerry Montgomery's arrest on September 8, 2004. That night, Jones called Terry and told him that "one of my homies just called me . . . [who] [u]sed to work with me on my team" and reported that "your [Terry's] buddy," Jerry "just got popped off [arrested]" and "he [Jerry] flew my name." Jones explained to Terry that Jerry had called Jones, and Jones advised Jerry, "you got some . . . green cause he can . . . he will go away with some of that for sure," meaning that Jerry could bribe Jones's associate to release him. Terry's response demonstrated that he understood what Jones meant: Terry asked him: "[Y]ou guys . . . they can't cut him loose or nothing can they?" The next day, Jones

and Terry were discussing Jerry's situation when Jones told Terry that Jerry once had taunted him with a bag of money and that Jones responded by telling Jerry that he was lucky Jones knew him because he "can call some cars right now . . . [b]e like, whoop, whoop . . . [a]nd grab your ass and follow you." This statement reflected Jones's ability to have other officers pull someone over. In addition, on October 27, 2004, shortly after Jerry got out of jail, he was pulled over. Jones called Terry to inform him that one of Jones's buddies called Jones to report that they had pulled Jerry over and Jerry was talking again. Jones assured Terry that his buddies were "just going to f— with [Jerry] for a minute." The next day, Jones told Terry that "[y]our man [Jerry] was talking a little bit" and "brought up" Jones's name and also mentioned "B"—Terry's nickname—in the sense that Jerry was pointing a finger at "B." Jones assured Terry that he was going to meet his buddy and he'd find out what Jerry had said. Thus, the wiretap evidence permitted a reasonable jury to find that Terry knew that other bad cops were assisting Jones in his criminal activities.

Moreover, the evidence clearly established that Terry was aware of coconspirator Flagg. Both Terry and Flagg participated with Jones in the Townsend ripoff. Once Flagg arrived on the scene with Jones and ripped off Townsend, Terry knew that Flagg was in on Jones's criminal activities. And a few days after the ripoff, Terry asked Jones about "the split" between him and his "buddy," meaning Flagg.

The evidence also supported a finding that Terry participated in the conspiracy both before and after the

Townsend ripoff. For one, telephone records for July 21, the day Jones, Black, and others attempted to rip off drug couriers near Ashland and 85th Street, show six calls between Jones and Terry. A few of these were made within two minutes of calls between Jones's cell phone and a cell phone registered to or used by other members of the conspiracy: Corey Flagg and Erik Johnson. In addition, on September 14, Jones told James Walker in a recorded conversation that "B" was coming over to his house that night and he was supposed "to have something." Jones added that "when he come . . . it's serious business." Given the evidence, a reasonable jury could infer that the "something" that Terry would have would be another opportunity to rip off a drug dealer. Moreover, in an October 7, 2004, conversation, Jones was praising Terry's performance and said, "yeah, you good. . . . I'm thinking like damn, that man got a demo." (Jones testified that "demo" meant criminal activity.) And Terry asked him, "Which, which one you talking about?" Terry's question implies there were several "demos" and thus supports the inference that Terry participated in more than one ripoff. Then, on November 13, 2004, Jones called Terry and Terry said, "I thought you wanted to link up. . . . [Y]ou had said you wanted to holler at me this week for something." Jones responded, "Oh, yeah . . . I just tried to do something" but it "didn't go through." The jury could reasonably find that this referred to the plan to rip off the Mexican drug dealer. Jones added that he hoped it would go through tomorrow when he got to work. Terry responded, "you let me know," which a jury could reasonably infer

indicated his continued interest in participating in Jones's schemes. And even later, on November 23, 2004, Jones and Terry were recorded discussing plans for another ripoff.

In arguing that the wiretap evidence does not prove that he participated in a conspiracy larger than the single ripoff of Townsend, Terry selectively identifies a September 22 phone call between Jones and Joel Montgomery in which Joel tells Jones how to contact the "old girl." Jones says that he will tell "B" to contact her and then Jones and Joel agree not to tell "B" that Joel was the source for the "old girl's" phone number. Terry also points to a call between himself and Jones in which Terry asks Jones if he told Joel about Terry. Jones says he said Terry wanted Townsend's phone numbers, but claimed not to know why Terry wanted them. While Terry submits that these calls show that Jones was keeping him in the dark about the extent of his criminal activities, the jury was in the best position to weigh this evidence against the other evidence that reasonably suggests that Terry's involvement ran deeper than he claims.

The government's evidence supports the finding that Terry, Black, Jones, Flagg, and other coconspirators were acting in furtherance of a single, illegal purpose. Terry set up drug dealers and couriers to be ripped off, and Jones, Black, and other corrupt cops performed the stops, invasions, and seizures of the drugs and money. This was not a rimless hub-and-spoke conspiracy.

Terry asserts that there was no evidence that he had any direct communication with any coconspirator

other than Jones. However, "[c]oconspirators do not have to have contact with, or even know, all of the other conspirators." *United States v. Frazier*, 213 F.3d 409, 415 (7th Cir. 2000). And coconspirators need not participate in every aspect of the scheme. *Avila*, 557 F.3d at 814. The evidence supported the finding that Terry was aware that others were assisting Jones in planning and conducting the ripoffs; Terry did not have to talk with them to gain that knowledge.

To find for Black and Terry on their conspiracy variance claims, we would have to reweigh the evidence and second-guess the jury's credibility determinations. In the absence of truly exceptional circumstances, and they have not pointed to any, we cannot do so. *See Dean*, 2009 WL 2341676, at *5. Accordingly, we conclude that there was sufficient evidence from which a reasonable jury could have found Black and Terry guilty of the conspiracies with which they were charged in the indictment.[6]

Black and Terry also suggest that the district court erred in failing to give a multiple conspiracies instruction. Because neither of them requested a multiple con-

---

[6] Even if there had been a variance, it would not necessarily require reversal of their convictions. *Bustamante*, 493 F.3d at 885. The "prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged." *Id.* (quotation omitted). The government easily proved that Black and Terry at the very least joined a subset of the alleged conspiracies.

spiracies instruction they forfeited this challenge on appeal and our review is for plain error only. *See Longstreet*, 567 F.3d at 921. We find no error—plain or otherwise—in the failure to give a multiple conspiracies instruction in this case. As discussed, the evidence was sufficient to establish Black's and Terry's participation in the overall conspiracy charged in the indictment.

### 2. Black: Sufficiency of Evidence for § 924(c) Conviction

Black argues that the evidence was insufficient to sustain his firearm conviction under § 924(c). He doesn't dispute that he carried a firearm *during* the attempted ripoff; he disputes only whether he carried the firearm "in relation to" the attempted ripoff. Section 924(c) requires a nexus between the firearm and the alleged crime; mere possession of a firearm by a person engaged in criminal activity is insufficient. *United States v. Harvey*, 484 F.3d 453, 457 (7th Cir. 2007). Black claims that the evidence failed to establish any nexus between his weapon and the July 21 attempted ripoff. (Recall the deferential standard of review for such challenges and the high hurdle a defendant must clear to gain relief on such an appellate challenge. *See Hensley*, 574 F.3d at 390.) The government responds that Black forfeited this challenge by failing to raise it when moving for judgment of acquittal. Black doesn't argue otherwise, so we review for plain error. Under this standard, a defendant must show "that a manifest miscarriage of justice will occur if his conviction is not reversed." *Id.* at 390-91

(quotation omitted). In other words, the record must be "devoid of evidence pointing to guilt" or "the evidence on a key element" must have been "so tenuous that a conviction would be shocking." *Id.* (quotation omitted). Black can't meet this standard.

The government argues that the evidence was sufficient to prove that Black carried a firearm during and in relation to the July 21, 2004 attempted ripoff.[7] We addressed a similar argument in *United States v. Moore*, 363 F.3d 631 (7th Cir. 2004), *rev'd sub nom. by Young v. United States*, 543 U.S. 1100 (2005). In that case, the defendant police officers were convicted under § 924(c) for carrying firearms while engaging in acts of robbery and extortion and while escorting drug couriers around. On appeal, they argued that it was just a coincidence that they carried their service revolvers during the acts for which they were convicted—they were cops and cops had to carry weapons. We rejected their argument, concluding that the evidence established that they carried guns in relation to a drug trafficking offense. *Id.* at 640-41. We reasoned that just as a police badge and so-called "cop talk" were essential to their drug escort activities, so were their weapons. *Id.* at 640. The defendants were hired "to play the role of a police officer, which necessarily entails carrying a service revolver" and "to use their status as police officers, with all the trappings, to

---

[7] Black makes a few arguments related to the possessed "in furtherance of" prong, but the government relies on the carried "during and in relation to" prong.

protect [the] drug couriers." *Id.* at 641. This we concluded was sufficient to support their convictions for carrying a gun in relation to a drug trafficking crime. *Id.*

We reached a similar result in *United States v. Patterson*, 348 F.3d 218 (7th Cir. 2003), where the defendant police officer was convicted of a firearms offense in relation to a drug trafficking offense. Patterson did not dispute that he possessed his service revolver while attempting to steal narcotics and money. He argued, however, that the evidence failed to prove that he carried the firearm for the purpose of accomplishing the ripoff. *Id.* at 226. We said that the "in relation to" language required that the firearm "'have some purpose or effect with respect to the drug trafficking crime . . . [and] the gun at least must facilitate, or have the potential of facilitating, the drug trafficking offense.'" *Id.* (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993) (internal quotations and alterations omitted)). We found this standard satisfied for two reasons. First, the firearm was necessary for the plan that required the defendant to pretend to be performing a legitimate police raid, which required legitimate-looking officers, which in turn, required them to carry firearms. And, second, we concluded that the jury could have found that the firearm provided the defendant with a needed sense of security. *Id.* at 227.

The reasoning in *Moore* and *Patterson* applies to Black's case as well. Black's participation in the conspiracy was sought because he was a police officer who wore a uniform, had a badge, and could effect traffic stops and seizures, and conduct other police work. A reasonable

jury could have found that Black carried his police hand-gun in order to make it appear that he was a legitimate cop performing legitimate police work. Black contends that there was no evidence that his weapon was exposed, drawn, or brandished during the attempted ripoff. That makes no difference. A reasonable jury could still conclude that he carried his gun in an effort to appear to be a legitimate police officer, performing a legitimate stop. At the least, a reasonable jury could have found that the gun provided Black with a sense of security, something that would come in handy when one is attempting to rip off a drug dealer. We therefore find that the evidence was sufficient to establish the required nexus between Black's weapon and the July 21 attempted ripoff.

Black next suggests that the § 924(c) charges in Counts Four and Seven were duplicitous, requiring reversal of his § 924(c) convictions. He also claims that the district court conflated the possessed "in furtherance of" and used or carried "during and in relation to" prongs of § 924(c). Counts Four and Seven charged that Black "knowingly possessed a firearm in furtherance of, *and* used, carried, and brandished a firearm during and in relation to, a drug trafficking crime . . ." in violation of § 924(c). The court's jury instructions on Counts 4 and 7 read:

> To prove defendant Black guilty of the weapons offense as charged . . . , the government must prove the following propositions:

> First, that the defendant committed one of the following crimes: [as charged in the relevant Count]; and

Second, that the defendant knowingly possessed a firearm in furtherance of, or knowingly used or carried a firearm during and in relation to, that crime.

"An indictment is duplicitous if it charges two or more offenses in a single count." *United States v. Pansier*, No. 07-3771, 2009 WL 2448414, at *7 (7th Cir. Aug. 12, 2009). Black did not raise a timely challenge to the indictment in the trial court, so again, we review for plain error. *See United States v. Presbitero*, 569 F.3d 691, 698 (7th Cir. 2009). Under this standard, "we will reverse only if there was an error, that was plain, that affected the defendant's substantial rights, and that affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* We find no plain error here.

Black cites *United States v. Savoires*, 430 F.3d 376 (6th Cir. 2005), which states that § 924(c) criminalizes two separate and distinct offenses: (1) a "use" or carriage offense, which has "during and in relation to" as "its standard of participation," and (2) a "possession" offense, which has "in furtherance of" as its standard. *Id.* at 379-80 (quotation omitted). We, however, have not decided that § 924(c) criminalizes two separate and distinct offenses. *See Harvey*, 484 F.3d at 456 (noting that whether we construe § 924(c) as creating one offense or two, its separate parts criminalize similar behavior). And our case law suggests that § 924(c) charges one offense that may be committed in more ways than one. The indictment in *Moore* charged the defendants with using *and* carrying a firearm in relation to a crime of violence

or drug trafficking offense in violation of § 924(c). One jury instruction tracked the indictment's language. Another stated that the government had to prove "that the defendant used *or* carried a firearm during and in relation to" the drug trafficking crime or crime of violence. The defendants challenged the instructions, arguing, *inter alia*, that they were deprived of a unanimous verdict. *Moore*, 363 F.3d at 639. We found no error, explaining that "where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count . . . . And proof of any one of those acts conjunctively charged may support a conviction." *Id.* at 640 (quoting *United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994)). We thus concluded that the indictment charging the defendants with using *and* carrying firearms was not duplicitous and found no error in the instructions. *Id.*

Here, the jury instructions covered the three ways in which § 924(c) may be violated: (1) possessed in furtherance of, and (2) used or (3) carried during and in relation to the drug trafficking crime. Under *Moore*, the three ways in which § 924(c) can be committed may be alleged in the conjunctive in one count, as they were here, and proof of any one of them will support Black's conviction. Therefore, we conclude that Counts Four and Seven were not duplicitous and there was no error in the § 924(c) instructions.

Even assuming error in those instructions, the probability that the error affected the outcome of this case is nil. Of the three ways that § 924(c) may be violated, the

"carry" prong is the lowest standard of participation. "Carry" includes carrying a firearm directly on the person or in a vehicle. *Muscarello v. United States*, 524 U.S. 125, 131 (1998). "Uses . . . a firearm" is construed narrowly and limited to the "active employment" of a firearm. *Muscarello*, 524 U.S. at 136 (quotation omitted). And "to the extent that the phrase 'in furtherance of' differs at all from the phrase 'during and in relation to,' the former wording logically connotes a higher standard of participation." *Harvey*, 484 F.3d at 457. A finding that Black possessed a firearm in furtherance of, or used a firearm during and in relation to a drug trafficking crime, would encompass a finding that he carried a firearm during and in relation to that crime. Thus, any error in instructing the jury on all three prongs of § 924(c) was harmless.

In a footnote in his reply brief, Black for the first time complains of sentencing manipulation and disparity, noting that Johnson received a nine-year sentence for the exact same offenses that resulted in his forty-year sentence. He invites the government to explain the disparity. To the extent Black attempts to raise an appealable issue based on sentencing manipulation, he has waived it by failing to assert it in his opening brief and by making it only in a footnote, in passing, and without any discussion or citation to pertinent legal authority. *United States v. Boisture*, 563 F.3d 295, 299 n.3 (7th Cir. 2009) (finding waiver of argument raised for the first time in appellant's reply brief); *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) (making clear that perfunctory and undeveloped arguments and arguments

unsupported by pertinent authority are waived). This isn't sentencing manipulation anyway. *See United States v. Wagner*, 467 F.3d 1085, 1090 (7th Cir. 2006). It seems that much of the difference between Black's and Johnson's sentences can be attributed to the fact that Johnson pled guilty to two counts pursuant to a plea agreement, whereas Black did not—he was convicted of six counts following a jury trial; and Johnson was given a reduction for acceptance of responsibility; Black was not. It is commonly understood that defendants who plead guilty typically receive a lesser sentence than those who don't.

### 3. Terry: Evidence of Drug Quantity & Coconspirator Statements

Terry contends that the district court erred in denying his motion for judgment of acquittal and motion for a new trial because the government presented insufficient evidence to prove that he possessed at least five kilograms of cocaine. In support, he first argues that the court erred in admitting evidence of the October 7, 2004, telephone call between Jones and Ricky Dee. He also argues that the other trial evidence was insufficient to establish the drug quantity.

The district court admitted the evidence of the Jones-Dee call as coconspirator statements under Fed. R. Evid. 801(d)(2)(E). In the recorded conversation, Jones tells Dee that he had "a five, five demo with my man." When Dee asked Jones where he got "that lick," Jones said that "one of my homies who, uh, you know be grabbing ten of

them at a time and s–t. He decided to woo-wop this broad this time, you know?" Presumably, the homie was Terry, the "ten" was ten kilograms, the "broad" was Townsend, and the "five, five" was the division between Jones and Terry of the seized drugs.

Under Rule 801(d)(2)(E), a "statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." For coconspirator statements to be admissible, the government must prove by a preponderance of the evidence that "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy." *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to Terry, the government failed to prove the third prong.

Whether the Jones-Dee statements were properly admitted under Rule 801(d)(2)(E) turns on whether the evidence was sufficient to prove that Terry joined the overarching conspiracy charged in the indictment. As noted above, it was. That Jones was a member of that conspiracy is undisputed—he was the ringleader. So we consider whether the Jones-Dee statements were made during and in furtherance of the conspiracy.

The call was made on October 7, 2004, well within the time frame of the conspiracy, which continued at least until the end of November 2004, if not later. Thus, the statements satisfy the "during" requirement. Statements intended to recruit other conspirators qualify as state-

ments in furtherance of a conspiracy. *United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir. 2001). In the call, Jones talks about prior ripoffs and arguably was trying to recruit Dee to buy drugs seized in the conspiracy. Though Dee was not a conspirator, his statements provided the full context for the conversation. Thus, the Jones-Dee statements were made in furtherance of the conspiracy, and the district court did not err in admitting them.[8]

Terry claims that the admission of the Jones-Dee call prejudiced him because it was the government's principal evidence that the Townsend ripoff occurred and involved more than five kilograms of cocaine. First of all, the drug quantity is not an element of the offenses. *See* 21 U.S.C. §§ 841(a), 846; *see also United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008). It is relevant to sentencing. If the evidence failed to establish that Terry possessed five or more kilograms of cocaine, and the district court sentenced him above the default twenty-year maximum applicable to any amount of cocaine, see 21 U.S.C. § 841(b)(1)(C), his remedy would not be a new trial but a remand for re-sentencing subject to the default statutory maximum term of twenty years. *Kelly*, 519 F.3d at 363. But the district court sentenced Terry to 168 months, which is below that statutory maximum, so "*Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] is not implicated," *id.*, and Terry has not shown prejudice.

---

[8] But even if erroneous, any error was harmless given the other evidence, described below, of the quantity of cocaine stolen from Townsend.

Furthermore, as Terry acknowledges, the government presented other evidence of the quantity of drugs involved in the Townsend ripoff. This included the September 22, 2004 wiretap conversation between Jones and Joel Montgomery while Jones was planning the Townsend ripoff in which Jones discussed with Joel how much cocaine Terry should get from Townsend, and they discussed five, seven, ten and twenty kilograms of cocaine. The evidence also included Flagg's testimony that: (a) Jones told him that Jones and Terry had planned to order ten kilograms from Townsend; (b) inside the bag taken from Townsend's car Flagg saw two bricks of what he believed were cocaine and saw several additional objects of like shape beneath the bricks, large enough to be ten kilograms; (c) Flagg believed that the bag contained ten kilograms; and (d) Jones told Flagg that Jones had given five kilograms to Terry and kept five for himself.

Terry asserts that because the Jones-Joel call occurred before the Townsend ripoff, it did not reflect the quantity of drugs actually stolen. True, the call did not reflect the historical fact of the quantity of drugs that was stolen from Townsend. But the statements about how much "B" should ask Townsend for support a reasonable inference as to the amount actually taken. The fact that Terry was going to try to buy X quantity from Townsend raises a reasonable inference that Townsend brought X quantity to the transaction with Terry which in turn raises a reasonable inference that X was the quantity that was stolen from her.

Terry also suggests that the Jones-Joel call supports a finding that the drug amount involved in the Townsend ripoff was less than ten kilograms. But he does not dispute that every amount Joel mentioned was greater than five kilograms. And Terry ignores that Jones stated that Townsend could handle a "dub," which Joel clarified meant "twenty," (kilograms), and Joel answered that she could. The Jones-Joel phone call thus supports Flagg's testimony that he saw what he believed was ten kilograms of cocaine.

Terry challenges the basis for Flagg's personal knowledge as to the drug quantity. However, Terry had the opportunity to cross-examine Flagg, and did so. Sure, Terry can claim that Flagg is incredible, and he may not be a choir boy, but it is not for us to judge his credibility. *See Dean*, 2009 WL 2341676, at *5. That was for the jury to decide. Terry asserts that Jones did not pay Flagg an amount commensurate with ripping off ten kilograms of cocaine. Terry claims it would be unreasonable to find that Jones skimped Flagg (who didn't get what he expected to get) and skimped Joel (who testified that he got nothing from the ripoff), but was generous to Terry. A jury could reasonably infer that Jones's "generosity" to Terry reflected Terry's role in the Townsend ripoff and Jones's trust of Terry. Anyway, Terry offers us nothing to show why it would be reasonable to expect Jones, a crooked cop, to treat his coconspirators fairly. Jones wasn't a man of principle.

Terry also complains that the prosecutor asked numerous improper leading questions of Flagg, testifying

as to the amount of drugs involved in the ripoff. For example, government counsel asked, "Did you ever receive any more money from [Jones] after that ripoff of the 10 kilos of cocaine?" Terry acknowledges that he did not object to any of the questions as leading. We have considered them and disagree that they were improper or leading. We also note that Flagg had already testified that he observed ten kilograms of cocaine before the government asked the allegedly improper questions.

We conclude that the evidence was sufficient to establish beyond a reasonable doubt that Terry possessed five kilograms or more of cocaine.

### 4. Terry: Foreseeability that Flagg Would Carry a Firearm

Terry contends that the evidence is insufficient to support his § 924(c) conviction because Flagg's presence at the Townsend ripoff was unexpected. He argues that it was not reasonably foreseeable to him that a coconspirator would have a weapon during the ripoff. The government offered no evidence, and did not argue, that Terry himself carried a weapon during the ripoff. However, Terry can be held liable for the acts of his coconspirators that were both in furtherance of the conspiracy and foreseeable to him. *United States v. Pinkerton*, 328 U.S. 640 (1946). As stated, we review challenges to the sufficiency of the evidence under a deferential standard, and a defendant making such a challenge faces a high hurdle. *Hensley*, 574 F.3d at 390. However, Terry did not raise this challenge below, so the

bar is even higher for him, and we review for plain error. *See id.* He can't clear the bar.

Terry first argues that the government failed to prove that Flagg used or carried a weapon in relation to or possessed a weapon in furtherance of the Townsend ripoff. However, the evidence supports the finding that Flagg carried a firearm during and in relation to the Townsend ripoff. As noted, "carry" under § 924(c) includes carrying a firearm directly on the person. *Muscarello*, 524 U.S. at 131. Flagg's testimony was that he had his firearm on his waistband during the Townsend ripoff.

For the same reasons that the jury could reasonably find that Black carried a firearm in relation to his criminal activities, discussed above, a reasonable jury could find that Flagg carried his firearm in relation to the Townsend ripoff. Flagg, like Black, was recruited to join the conspiracy because he was a police officer who could make the stops, home invasions, arrests, and seizures appear to be legitimate police work. Police officers carry guns. More specifically, Flagg was asked to participate in the Townsend ripoff for this very reason. A reasonable jury could find that Flagg's gun was neces-sary for the plan that required him to pretend to be per-forming a legitimate stop, which required him to look like a legitimate cop, which in turn, required him to wear a gun. In addition, the jury also could have concluded that Flagg's gun provided him with a sense of security, which would have come in very handy in ripping off a known drug dealer of such a large quantity of cocaine.

Terry argues that the evidence was insufficient because Flag was off duty, driving an unmarked squad car, wearing plain clothes, and not wearing a tactical vest. We do not understand how any of these circumstances make it unreasonable for a jury to conclude that Flagg carried his firearm in relation to the ripoff. As the government argues, the fact that Flagg was off duty raises a reasonable inference that it was not by mere chance that he had his CPD weapon on his person during the ripoff. And the absence of a police uniform or bulletproof vest seems to make it more likely that Flagg needed the gun to make it look as if he were a legitimate cop performing a legitimate stop and seizure. Terry also suggests that the evidence was insufficient because Flagg did not show his weapon and there was no evidence that Townsend even saw his gun. But, as mentioned, it makes no difference that the gun was neither exposed, drawn, nor brandished. Regardless of whether Flagg displayed his gun to Townsend, the jury could reasonably conclude that the presence of his gun in his waistband provided him with security—one of the reasons we found the evidence sufficient to establish that the *Patterson* defendant carried his firearm in relation to the drug trafficking crime. *See* 348 F.3d at 227.

The evidence was also sufficient to establish that it was reasonably foreseeable to Terry that a coconspirator would have a weapon during the Townsend ripoff. Terry submits that Jones cut him off from knowing what the other conspirators were doing. Terry complains that he didn't even know that Flagg was going to be there. According to Terry, he only spoke with Jones who by then

had been stripped of his police powers and couldn't carry a firearm. But the evidence need not establish that Terry knew that *Flagg* would carry a firearm. Nor does the government have to prove that Terry *knew* that a coconspirator would carry a firearm. The evidence need only establish that it was *reasonably foreseeable* to Terry that *a* coconspirator would carry a firearm.

The evidence was sufficient to support the finding that Terry arranged to buy ten kilograms of cocaine from Townsend and later met with her to set her up to be ripped off. Terry *knew* that he had arranged to buy a large quantity of cocaine, and he *knew* that he was setting Townsend up to be ripped off. Thus, a rational jury could infer that it was reasonably foreseeable to him that a firearm would be carried in relation to the ripoff. *See United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir. 1992) ("The illegal drug industry is a dangerous and violent business, and when an individual conspires to take part in a transaction involving a large quantity of cocaine (such as [one] kilogram . . .) it is reasonably foreseeable that a firearm would be carried."). The fact that Terry knew that Jones couldn't carry a firearm made it reasonably foreseeable to Terry that someone else would be involved and would carry a gun. Terry need not have known that person's identity ahead of time.

Finally, Terry complains that his § 924(c) conviction was based solely on the testimony of Flagg, who was an admitted liar and incredible. To address this claim, we would have to second-guess the jury's credibility deter-mination, which we cannot do in the absence of truly

exceptional circumstances. *See Dean*, 2009 WL 2341676, at *5. Terry has not identified such circumstances. We therefore conclude that a rational jury could have found sufficient evidence to convict Terry under § 924(c).

## B. Sentencing Issues

### 1. Haynes: Minor Role Reduction
### Under U.S.S.G. § 3B1.2(b)

Haynes challenges the district court's decision that he was not entitled to a minor role reduction in his offense level under U.S.S.G. § 3B1.2(b). We review the district court's interpretation and application of the Sentencing Guidelines de novo, *United States v. Abbas*, 560 F.3d 660, 662 (7th Cir. 2009), and we review the decision to deny a defendant a minor role reduction for clear error, *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008). We will find clear error only when our review of the evidence leaves us "with a definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted). A district court's minor role decision is rarely reversed because that court is in the best position to evaluate the defendant's role in the criminal activity. *Id.*

Under § 3B1.2(b), a defendant's offense level can be reduced by two levels if he was a minor participant in the criminal activity. A defendant is a "minor participant" if he "plays a part in committing the offense that makes him substantially less culpable than the average participant" and he "is less culpable than most other participants, but [his] role could not be described as

minimal." *United States v. Gonzalez*, 534 F.3d 613, 616 (7th Cir. 2008) (quotation omitted); *see also* U.S.S.G. § 3B1.2, cmt. n.3(A) & n.5. "'However, where each person was an "essential component" in the conspiracy, the fact that other members of the conspiracy were more involved does not entitle a defendant to a reduction in the offense level.'" *Gonzalez*, 534 F.3d at 616 (quoting *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007)). The defendant bears the burden of showing by a preponderance of the evidence that he is entitled to the minor role adjustment. *Id.*

Haynes contends that the district court erred in not applying the minor role adjustment because it did not compare his role in the conspiracy to that of the average member. He also argues that the record fails to support the finding that he was necessary to the conspiracy. The government agrees that a defendant's role should be compared to that of the average member of the conspiracy, but maintains that Haynes did not play a minor role. Although a defendant's "role should be compared to that of the average member of the conspiracy," *id.* (quotation omitted),[9] we have not required district courts to articulate elaborate comparisons on the record. Our cases emphasize that the comparison should be made to an average member, not to the leaders. *E.g.*, *id.*; *Gallardo*, 497 F.3d at 741.

---

[9] *Gonzalez* uses the arguably more permissive "should" rather than the mandatory "must" that Haynes uses.

In denying Haynes a minor role reduction, the district court reasoned that his participation

> was obviously necessary as a police officer. These things could not have been done or would have been much more difficult to do and much more dangerous were the participants not police officers. . . . And I cannot envision where the use of the authority and the power vested in a police officer in the commission of a crime is going to be deemed minor.

Haynes argues that his role as a police officer had no obvious relevance to his role in the offense as compared to others. But which others? Haynes acknowledges that the conspiracy included five police officers and "a number of laymen." We understand the district court's comments to mean that none of the five conspiring police officers could be considered a minor participant. Each defendant officer's participation was essential to the success of the conspiracy. No matter which ripoff or attempted ripoff is considered, a police officer's presence was essential. It is even fair to say that the presence of two officers was necessary to convey the impression to the drug dealers and couriers that these were legitimate cops making legitimate stops and conducting legitimate searches. After all, the record establishes that at least two officers assisted in executing each illegal stop and home invasion for which Haynes was sentenced. That some of the other defendant officers were more involved in the conspiracy than Haynes does not entitle him to a reduction as a minor participant. *See Gonzalez*, 534 F.3d at 616.

We have observed that the district court is best suited to address the role in the offense adjustment, particularly "after becoming intimately acquainted with the roles of the members of a drug conspiracy during [a lengthy] trial." *United States v. McGee*, 408 F.3d 966, 987 (7th Cir. 2005). Although Haynes pled guilty, Black and Terry were tried to a jury—before the same judge, Judge Guzmán, who sentenced Haynes. Over the course of the nine-day trial, Judge Guzmán was able to become quite knowledgeable about the various roles played by the conspiracy's members and he was thus able to draw comparisons between their roles in the conspiracy. So even though the court did not articulate a comparison of Haynes' role in the conspiracy to the role of the average member, we feel confident that he made the comparison in deciding whether Haynes was entitled to a minor role reduction.

In addition, the presentence report's calculation of Haynes' offense level was based on: (1) a ripoff of a drug dealer of one-half kilogram of cocaine and $7,000 in 2003; (2) the failed home invasion of a drug dealer in 2003; (3) the attempted ripoff on July 21, 2004; and (4) the failed Jerry Montgomery home invasion in September 2004. In his plea agreement, Haynes admitted to having a direct and active involvement in all four of these events. The conduct to which he admitted establishes that in each instance he played an essential role as a police officer making vehicle stops, seizing cocaine, and performing home invasions. Haynes admitted that during the invasion of Jerry Montgomery's home, he spoke with and displayed his badge to a neighbor who was ques-

tioning Haynes and Flagg about the legitimacy of their presence in the building. The presentence report also indicated that Haynes was aware of the entirety of the offenses and that he communicated with his codefendants while planning and conducting the offenses. So, too, Haynes admitted in his plea agreement to participating with Jones and Flagg in some of the planning to invade Jerry's home.

Haynes maintains that the court's reasoning for not giving him a minor role reduction implies impermissible double counting because the court also relied on his use of authority and power in applying an enhancement for abuse of trust. Impermissible double counting occurs when the district court imposes "two or more upward adjustments . . . when both are premised on the same conduct." *United States v. Blum*, 534 F.3d 608, 612 (7th Cir. 2008); *see also United States v. Shearer*, 479 F.3d 478, 484 (7th Cir. 2007) (stating that "impermissible double counting . . . occurs when identical conduct justifies two upward adjustments under the Guidelines" (quotation omitted)). The government argues that the court did not engage in double counting because the court made only one upward adjustment based on the same set of facts. We agree. Haynes is complaining that the court did not make a *downward* adjustment. Haynes offers no authority to suggest that declining to adjust an offense level downward based on the same facts that support an enhancement would constitute impermissible double counting. We have found some authority to the contrary. *See United States v. Elliot*, 307 Fed. Appx. 41, 43 (9th Cir. 2009) (unpublished) ("It is not impermissible double counting to consider [defendant's] obstruction of justice

conduct both in imposing a sentencing enhancement and as a basis for denying a discretionary downward departure under the Sentencing Guidelines."). Therefore, we find no impermissible double counting in Haynes's case.

Moreover, "[t]he presence of some factual overlap is not sufficient to trigger the prohibition on double counting . . . where the two enhancements address distinct aspects of a defendant's conduct." *Blum*, 534 F.3d at 612. Here, the facts supporting the adjustment for abuse of trust are only a subset of the complete set of facts which support the finding that Haynes did not play a minor role. His status as a police officer gave him the apparent authority to conduct what would seem at first glance to be legitimate stops, thereby abusing the trust placed in him. But as a police officer Haynes had special skills and experience that allowed him to make the illegal stops and home invasions. And the gun, vest, uniform and other accouterments of law enforcement came in quite handy during the execution of ripoffs. So the "on the ground" aspects of his policeman status made him an integral, not minor, actor in the ripoffs. Thus, even if applying one enhancement and refusing to make a downward adjustment could be considered "double counting," there was no double counting here.

Haynes' role in the conspiracy was not as great as some of his coconspirators', but it was essential. He has not shown that he was a minor participant. Therefore, we reject his challenge to the district court's finding that he was not entitled to a reduction in offense level under § 3B1.2.

### 2.  Haynes and Jones: Use of Body Armor Under U.S.S.G. § 3B1.5(2)(B)

Haynes argues that the court erred in applying a four-level enhancement for use of body armor because it did not adequately explain why it imposed a four-level adjustment instead of two, which he had argued was appropriate. He does *not* challenge the factual finding that he "used" body armor. Haynes claims that it is unclear from the Guideline what behavior falls under § 3B1.5(2)(B) that warrants more severe punishment than that under § 3B1.5(2)(A).

U.S.S.G. § 3B1.5 states:

If—

(1) the defendant was convicted of a drug trafficking crime or a crime of violence; and

(2)(apply the greater)—

> (A) the offense involved the use of body armor, increase by 2 levels; or

> (B) the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense, increase by 4 levels.

Section 3B1.5(2)(A) applies when *the offense* involved the use of body armor, for example, when a codefendant used body armor. Section 3B1.5(2)(B), however, applies when *the defendant* himself used body armor. There is nothing ambiguous about (2)(A) and (2)(B) when read together; the two subsections are quite different.

Haynes admitted that he wore his bulletproof vest during the invasion of Jerry's house. Section 3B1.5(2) directs the sentencing judge to "apply the greater" of (2)(A) and (2)(B). The judge correctly applied § 3B1.5(2)(B) rather than §3B1.5(2)(A) here. He was not required to give a more extensive explanation than he did for applying the four-level enhancement.

For his part, Jones contends that the district court miscalculated his offense level by applying enhancements both for an abuse of trust under § 3B1.3 and for use of body armor under § 3B1.5.[10] He argues that this was error because § 3B1.3 states that the "adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." According to Jones, the body armor was part of his uniform as a CPD officer and a specific offense characteristic. He claims that the defendant officers wore body armor only to make their targets believe they were legitimate CPD officers engaged in legitimate law enforcement.

His argument ignores that a "specific offense characteristic" has a particular meaning in the Guidelines, referring to adjustments to the base offense level contained in Chapter Two. U.S.S.G. ch. 2, introductory cmt. ("Chapter Two . . . is organized by offenses . . . . Each offense has a corresponding base offense level and may have one or more specific offense characteristics that adjust the offense level upward or downward."). Chapter Three

---

[10] Jones doesn't challenge the enhancement for abuse of trust, only the enhancement for use of body armor.

Adjustments are not "specific offense characteristics." *See* U.S.S.G. § 1B1.1(b), (c). Section 2D1.1, the offense Guideline applicable to Jones's offense of conviction, does not have a specific offense characteristic for abuse of trust or use of body armor. *See* U.S.S.G. § 2D1.1(b). Instead, the adjustments for abuse of trust and use of body armor were made under Chapter Three, which are not specific offense characteristics.

Furthermore, Jones gives us no reason to equate the use of body armor with "an abuse of trust" in this case. The district court rejected Jones's argument that he used body armor only to make it look like he was a legitimate officer engaged in legitimate law enforcement. The court drew the reasonable inference that the body armor was being used for its primary purpose—for protection. The fact that the body armor may also have been used to identify the defendant officers as legitimate Chicago cops engaged in lawful police activity doesn't make the enhancement inappropriate. *See United States v. Barrett*, 552 F.3d 724, 728 (8th Cir. 2009) ("The ability of body armor to serve dual purposes does not make § 3B1.5 inapplicable where the facts show one purpose could be to protect the wearer from gunfire."). We therefore find no error in the district court's application of both § 3B1.3 and § 3B1.5 in determining Jones's sentence.

### 3. Argument Preservation

Haynes also argued that the district court erred in imposing a 60-month consecutive sentence for his firearm conviction under 18 U.S.C. § 924(c)(1)(A) because

he was already subject to a ten-year mandatory minimum under 21 U.S.C. § 841(b)(1)(A)(ii)(II). He concedes that *United States v. Easter*, 553 F.3d 519, 525-26 (7th Cir. 2009), *petition for cert. filed* (U.S. Mar. 26, 2009) (No. 08-9560), *and petition for cert. filed* (U.S. May 20, 2009) (No. 08-10584), forecloses this argument. He now seeks to preserve the issue for review in the Supreme Court.

The government submits that Haynes waived the argument by requesting the court to impose a consecutive five-year sentence. Haynes did not challenge whether a consecutive sentence was appropriate, but we do not understand him to have been affirmatively requesting such a sentence. His challenge was to the length of the sentence under § 924(c)—the government argued for the seven-year minimum—not to whether a consecutive sentence was proper in the first instance. We find no waiver of an objection to the consecutive nature of the sentence; the argument was forfeited instead. Thus, Haynes has preserved the argument, although it is foreclosed by our binding precedent.


### III.  Conclusion

None of the challenges to the evidence, the convictions, or sentences raised by these defendants earn them any relief. The district court's judgments are AFFIRMED.